# THE STATE. v. LULU KENNEDY, Appellant.

### Division Two, July 3, 1903.

1. **Statement to Jury:** ATTACKING DEFENDANT'S CHARACTER. Notwithstanding the statute provides that after the jury is impaneled and sworn, the prosecuting attorney must state the case and offer the evidence in support of the prosecution, the prosecuting attorney was permitted to make two statements, an opening statement, and a reply statement to the statement made in behalf of defendant, and in the latter, over the objection and exception of defendant, was permitted to make an assault upon defendant's character, and to declare that "in the years prior to the time when she came into the life of deceased . . . she could not have been led by him from the path of virtue." *Held*, that this statement, made with the approbation of the court, was prejudicial, and just as much so as if the prosecution had been permitted to prove the character of defendant to be bad when she never put her character in issue.

2. **Murder:** CONSPIRACY: NOT CHARGED. Although not absolutely necessary, the better practice is, if the State desires to show a conspiracy between the accused and other persons, to join all the conspirators as defendants in the indictment, or to aver therein the existence of such conspiracy, the parties thereto if known, and their purpose, for then the defendant upon trial will have reason to anticipate what evidence may be offered against him, and be prepared to meet it.

   *Held*, by GANTT, P. J., in a dissenting opinion, that where the conspiracy is merely the common purpose leading up to another distinct crime, it need not be alleged in the indictment, nor all the conspirators indicted.

3. ————: ————: AFTER CRIME COMMITTED. Nothing said or done by one conspirator after the crime is accomplished is admissible against another in proof.

4. ————: ————: EXISTENCE: ACTS AND WORDS: ANOTHER CRIME. A prima facie existence of the conspiracy must first be shown, and then when in the opinion of the court this has been done, the statements and acts of any of the conspirators made and done in pursuance of a common design to commit the crime for which the defendant is being tried, may be proven. Proof of a common design to commit another offense against the same person is not proof of a conspiracy to commit the crime with which defendant is charged.

*Held*, by GANTT, P. J., dissenting, that it rests largely within the discretion of the trial court as to when the acts and statements of the co-conspirators shall be offered, it being the right of the prosecution to prove the declarations and acts of one made and done in the absence of the others, before proving the existence of the conspiracy, provided proof is afterwards made. *Held*, further, that conspiracies, like any other fact, may be established by circumstantial evidence, and it is not essential that it be established by express agreement or compact. *Held*, further, that the conspiracy is sufficiently shown when it is made to appear that the common purpose was to commit an unlawful act, even one dissimilar to the crime actually perpetrated, ·if the latter was one that might have been contemplated as likely to result from the attempt to commit the act intended.

5. ———: ———: ———: ———: ———: FORCED MARRIAGE. The evidence showed a conspiracy between defendant, her father and two brothers to compel deceased to marry her, and to kill him if he refused to do so, and it showed a conspiracy between her and one of the brothers to kill him if he did not live with her after such marriage. *Held*, that, on her trial for murder, the acts and statements of this brother with respect to the homicide after this conspiracy was formed up to and at the killing, were admissible in evidence against her; but as there was no conspiracy shown between her and her father and the other brother to kill deceased, any acts or statements of her father and this brother in regard to the homicide were inadmissible.

*Held*, by GANTT, P. J., dissenting, that the evidence, which is set out at length, shows that not only the one brother, but both brothers and her father, had entered into a conspiracy with defendant to force deceased to marry her or kill him, and having succeeded in that, to force him to live with her or if he refused to do so or attempted to obtain a divorce, to kill him. And, therefore, the statements made and the acts done, by each and all of them from the time the conspiracy was hatched to its ultimate result in the killing by her of her husband six weeks after the coerced marriage, were properly admitted in evidence in a trial of her alone, under an indictment which neither charged conspiracy nor named them as defendants.

6. ———: ———: ———: ———: ———: ———: SPECIFIC OBJECTION. A newspaper reporter testified that at the time the marriage license was secured the deceased undertook to talk to him, and defendant's father pressed in between them and said, "No you don't; this isn't over yet," and the objection offered to the admission of this evidence was that it was "incompetent, irrelevant and immaterial." *Held*, that, whether the objection was specific enough or not, the statement had no tendency to show a conspiracy to kill deceased unless he lived with her after the marriage.

State v. Kennedy.

*Held,* by GANTT, P. J., that this evidence was proper to show the relations between defendant and deceased, and to show who were the parties compelling and assisting in enforcing the marriage ceremony.

7. ———: ———: ———: ———: ———: ANOTHER INCIDENT. After the forced marriage and deceased's failure to live with defendant, her father presented a bill to him for her board for one month, and asked him, "Are you going to pay it?" to which deceased said, "No," and thereupon the father said, "I will show you what a low-down s— o— a b— you are; you don't deserve to live." *Held,* that this answer, made in defendant's absence, did not tend to show a conspiracy between the father and defendant to kill deceased, and was clearly inadmissible. (GANTT, P. J., dissenting.)

8. ———: ———: ———: ———: ———: CONVERSATIONS. A private conversation between defendant, her father and brothers in the father's place of business, two or three hours before the homicide, does not tend to show a conspiracy to kill.

9. ———: ———: ACCESSORIES. Where the acts or statements of defendant's father and brothers tend to show them to be accessories or accomplices, if anything, they should not be admitted in evidence against defendant on the theory that they were conspirators. Especially should they not be admitted on that theory if they tend to show that the homicide was committed with malice and deliberation and defendant guilty of murder in the first degree, whereas but for such evidence defendant might have been found guilty of manslaughter.

10. ———: ———: INSTRUCTIONS. Whether or not there was a conspiracy between defendant and others to kill deceased was a question to be found in the affirmative by the jury before the statements and acts of the conspirators could be considered in evidence against defendant, and the court should have so instructed the jury whether asked to do so or not, and having failed to do so it committed error.

11. ———: ASSOCIATION WITH OTHER MEN: INSANITY. The State was permitted to introduce in chief recitals at great length of the fact that defendant during the summer before deceased was forced to marry her in December, kept company with a baseball player who lived in New York, and when he went away with her diamond ring she went there in October and got it. The defense was insanity, and it is claimed that these facts were offered as showing that her conduct was that of a rational person, but the record shows that they were offered for the purpose of besmirching defendant's character, as is shown by the stress placed upon the fact, both in the prosecuting attorney's opening statement and throughout the trial, and by the irrelevant questions of the trial judge, that the man whom she kept company with was a baseball player. *Held,*

that the evidence was improper in chief, and, as defendant did not testify and hence did not put her good character in issue, it could not have been used in rebuttal.

*Held*, by GANTT, P. J., that, as the defense interposed was emotional or hysterical insanity produced by a breach of a promise by deceased to marry her, this evidence was pertinent to disabuse the minds of the jury of any belief that defendant's mind was deranged by the treatment she received from deceased. Besides, it was competent as a part of her acts and statements during the months preceding the forced marriage and homicide, to prove that she was rational.

12. ———: DECEASED'S PETITION FOR DIVORCE. After deceased was forced to marry defendant and had refused to live with her, he brought suit against her for divorce. *Held*, that, on her subsequent trial for killing him two days thereafter it was not competent to read this petition to the jury, since it was nothing more than the verbal statements of deceased made in his lifetime, and was, therefore, incompetent for any purpose.

*Held*, by GANTT, P. J., that, as one of the conspirators had made threats against deceased if he brought such suit, the fact that it was begun was admissible in evidence in connection with the threats.

13. ———: PHYSICIAN: PRIVILEGED COMMUNICATION. As a general rule, under the statute declaring that a physician shall be incompetent to testify concerning information acquired by him from a patient while attending him in his professional capacity, "which information was necessary to enable him to prescribe for such patient as a physician," the physician must determine for himself whether the information acquired by him from the patient was necessary to enable him to prescribe for such patient. In the absence of a showing to the contrary, the presumption must be indulged that the information acquired from the patient was necessary to enable him to prescribe for the patient; otherwise, the physician would not have desired it. Where the condition of the patient is not apparent to the ordinary observer it is not for the courts to say that the information the physician acquired from him was not necessary to enable him to prescribe for the patient.

*Held*, by GANTT, P. J., in a dissenting opinion, that the request made by defendant of a physician whom she had formerly tried to induce to perform an abortion on her, to go to her husband, who had been forced by her father and brothers to marry her six weeks previously, and say to him that she was still pregnant, which fact she then stated to him, not at a time when she was his patient, but only then, when she wished him to perform this friendly act under the pretense that it might induce him to with-

draw his suit for divorce, but actually for the purpose of decoying her husband into the hall where she killed him, was not incompetent as a professional communication. The relation of physician and patient did not exist as to the communication then made, and for that reason it was admissible. But the communication made to him formerly when she spoke about the abortion was incompetent, but as it was not objected to the error is not reversible. And, a statement made at another time when he treated her, in answer to an inquiry, that she was not pregnant, was incompetent, but as it was abundantly shown by other evidence that she was not pregnant at any time after the homicide, permitting the physician to disclose that information was immaterial, because defendant could not have been prejudiced thereby.

14. ————: SEDUCTION AS DEFENSE: STATEMENT BY DECEASED. *Held,* by GANTT, P. J., that statements made by deceased to other persons in his lifetime that he had seduced defendant and then refused to marry her, are not competent in a trial of defendant for subsequently killing him, even where the defense is hysterical insanity superinduced by deceased's treatment of her, connected with her uncontrollable anger aroused by his refusal to live with her when requested to do so by her at the time of the killing.

Appeal from Jackson Criminal Court.—*Hon. Jno. W. Wofford,* Judge.

REVERSED AND REMANDED.

*L. C. Boyle, W. F. Riggs* and *C. H. Nearing* for appellant.

(1)   The court erred in permitting the prosecutor to state in his opening statement, and to introduce testimony on behalf of the State, tending to show a conspiracy, and the acts and statements of the claimed conspirators. The offense of conspiracy, even if murder be the result, is as separate and distinct an offense as that of robbery. A conspiracy can not be by one person. An indictment for conspiracy must not only state some overt fact of such conspiracy (R. S. 1899, sec. 2632), but it must also name the conspirators if known. Wharton's Criminal Law, sec. 1388; State v. Covington, 4 Ala. 603; U. S. v. Cole, 5 McLean 513; Bishop,

Criminal Procedure, sec. 464; U. S. v. Cruikshank, 92 U. S. 542; U. S. v. Britten, 108 U. S. 199; U. S. v. Walsh, 5 Dill. U. S. 61; U. S. v. Haas, 124 U. S. 486; Pettibone v. U. S., 148 U. S. 197; Can v. Wall, 16 Gray (Mass.) 221; Alderman v. People, 4 Mich. 414; State v. Term, 2 Dev. 69; Jones v. Boker, 7 Cow. 445; People v. Richards, 1 Mich. 216, 51 Am. Dec. 84; Wharton, Criminal Law (10 Ed.), sec. 1388; Wharton, Criminal Practice (9 Ed.), sec. 305. The only cases where evi: dence of a conspiracy has been admitted without distinct allegations of such in the indictment, have been where several have been jointly indicted or named in the indictment as conncted with the offense. The existence or non-existence of the conspiracy was a question for the jury; upon that issue depended the competency of the statement of the claimed conspirator. How could that possibly be determined except the question of conspiracy was an issue? Bishop Criminal Procedure, sec. 519. (2) The court erred in overruling defendant's objection to the statements of defendant to her physician when treating her. Gastride v. Ins. Co., 76 Mo. 446; Scripp v. Foster, 41 Mich. 748; Pierson v. People, 18 Hun 245; Penn. Co. v. Marion, 123 Ind. 421; Huesten v. Simpson, 115 Ind. 63; Edington v. Ins. Co., 67 N. Y. 194.

*Edward C. Crow,* Attorney-General, *Sam B. Jeffries,* Assistant Attorney-General, *H. S. Hadley* and *Frank G. Johnson* for the State.

(1) The evidence in support of the claim of insanity was so meager that the trial court would not have erred under the decisions of this court if it had withdrawn it from the consideration of the jury. State v. Ward, 74 Mo. 253; Cutler v. Zollinger, 117 Mo. 192. (2) It is not necessary to charge a conspiracy in the indictment in order to make the evidence of a conspiracy possible. Wharton, Criminal Ev. (9 Ed.), sec.

701; 3 Rice's Criminal Ev., sec. 578; Gains v. State, 46 Ohio St. 457; United States v. Cole, 5 McLean 513; Blount v. State, 59 Ark. 422; People v. Linn, 39 Cal. 75; People v. Geiger, 49 Cal. 643; People v. McCane, 80 Hun. 322. (3) No error was committed by the court in permitting the prosecuting attorney to detail to the jury what he expected the evidence would show as to statements and acts of Will Prince, Bert Prince and C. W. Prince. Such statements and acts would be admissible after the introduction of evidence tending to show the existence of a conspiracy between defendant and the parties named. Weinstein v. Reed, 25 Mo. App. 41; State v. Daubert, 42 Mo. 241; State v. Cooper, 85 Mo. 260; State v. Walker, 98 Mo. 95, 598; State v. Crabb, 121 Mo. 562; State v. May, 142 Mo. 151; Whart. Crim. Law (9 Ed.), sec. 24; State v. English, 67 Mo. 137; R. S. 1899, sec. 2627; 3 Rice, Ev., 328; State v. Mewherter, 46 Ia. 88. "As a rule, any evidence that rebuts the main issue, or any minor inquiry, is pertinent." Rice, Ev., 328, citing: Com. v. Tinkham, 14 Gray 12; Aikins v. State, 16 Ark. 568; Spivey v. State, 26 Ala. 90; Lightfoot v. People, 10 Mich. 547; Coleman v. People, 55 N. Y. 81; State v. Shermer, 55 Mo. 83; Reid v. State, 50 Ga. 556; People v. Austin, 1 Park. Crim. Rep. 154; Crawford v. State, 12 Ga. 142. (4) Defendant objected to what was said by defendant to the doctor on the day of the killing. But the evidence shows that this visit to the doctor's office was not for the purpose of obtaining treatment or with reference to any treatment which had been given her, but was for the purpose of getting the witness to act as a go-between for her, ostensibly to communicate to her husband the information that she was pregnant. Therefore, what she said to the doctor on this occasion was not a privileged communication and this is true of all that she said to the doctor on that afternoon. The relation of physician and patient did not exist at this time between them. The statute does not make a physician or

surgeon incompetent to testify as to all information ac-
quired even from a patient; he is incompetent only as
to information which was necessary to enable him to
prescribe for such patient as a physician or do any act
for him as a surgeon. Linz v. Ins. Co., 8 Mo. App. 369;
Bowles v. Kansas City, 51 Mo. App. 416. On this point
the same principle applies to the relation of physician
and patient as to that of lawyer and client. Informa-
tion belonging to ordinary as distinguished from pro-
fessional intercourse, is not within professional privi-
lege. The topic must be within the prescribed scope
of a lawyer's profession. Wharton's Crim. Ev. (9
Ed.), sec. 503. The principle does not protect disclos-
ures which are not made in confidence to the lawyer or
physician in his professional capacity. Standard Oil
Co. v. Meyer Bros. Drug Co., 84 Mo. App. 80. The
privilege does not shield parties seeking for advice as
to prospective or past infractions of law. Wharton's
Crim. Ev., sec. 504; State v. McChesney, 16 Mo. App.
259. This principle applies to communications made
to a physician or surgeon. ''The privilege also does
not cover consultations for criminal purposes.'' Whar-
ton's Crim. Ev., sec. 516. Under these decisions any
communication made by defendant to Dr. Cross with
reference to an abortion would not be privileged. And
what defendant said with reference to her pregnancy,
if for any purpose of treatment, was for the purpose of
having an abortion performed. No disclosure was
made of any matter communicated to the doctor for the
purpose of enabling him to treat her for anything else,
so that it appears clearly that the court committed no
error in admitting the testimony of Dr. Cross. (5)
Instruction 7 in substance told the jury that if the act
of defendant was the result of uncontrollable passion
and revenge, then she could not claim the protection of
insanity. This court never has recognized the doctrine
of uncontrollable impulse. State v. Turlington, 102
Mo. 642; State v. Miller, 111 Mo. 542; State v. Pagels,

92 Mo. 300; State v. Soper, 148 Mo. 236. Mere emotional insanity or temporary frenzy or passion arising from excitement or anger and not from any mental disease, is never an excuse. Clark's Crim. Law, 58. The heat of passion produced by motives of anger, hatred or revenge, is not insanity. People v. Martin Foy, Jr., 138 N. Y. 664. "Where persons allow their anger to lead them so far as to make them reckless, the fact that they have become at last too infuriated to keep them from mischief is merely the result of not applying restraint in season. That condition which springs from undisciplined and unbridled passion is clearly within legal as well as moral censure and punishment." People v. Lulu Mortimer, 48 Mich. 37; People v. Finley, 38 Mich. 482; Welsh v. Ware, 32 Mich. 77. A frenzied condition of mind occasioned by allowing evil passion to control one's action, is not insanity. State v. Murray, 11 Oregon 413.

BURGESS, J.—At the April term, 1901, of the criminal court of Jackson county, the defendant was convicted of murder in the second degree, and her punishment fixed at ten years' imprisonment in the penitentiary, under an indictment theretofore presented by the grand jury of said county charging her with murder in the first degree for having at said county on the 10th day of January, 1901, shot and killed with a pistol her husband, Phillip H. Kennedy.

In due time defendant presented a motion for a new trial, which being overruled, she saved her exception, and brings the case to this court, by appeal, for review.

The defense was insanity, the homicide being admitted.

The salient facts which led to the killing are about as follows:

The defendant was about twenty-three years of age at the time of the homicide, and lived with her parents, and two brothers, Charles William and Albert K.

Prince, commonly called Bert. The deceased, Phillip H. Kennedy, was about thirty years of age at that time, and was employed as clerk and solicitor in the Merchants Dispatch Transportation Company, with offices on the second floor of the new Ridge building, situated on the east side of Main street between Ninth and Tenth, Kansas City. He lived with his father and mother, brother and sister. The defendant and the deceased had been acquainted for about two years prior to the killing, and in the latter part of 1899 and the early part of 1900 the deceased called on the defendant frequently at her home and at the place where she worked. In the month of April, 1900, Will, the brother of the defendant, noticed the attentions of the deceased to the defendant, went to him, and asked him if his intentions were serious. On being answered in the negative Will Prince requested Mr. Kennedy to cease calling on his sister, and after that time the evidence discloses that they were together but twice until the 4th day of December, 1900.

On December 4, 1900, the deceased was called by telephone, while in his office in the Ridge building, and asked to go at once to the office of Charles H. Nearing, a lawyer in the Nelson building, at Missouri avenue and Main street, on important business. Kennedy went to Mr. Nearing's office and was there informed by Mr. Nearing that he would have to marry Lulu Prince or her father would kill him. Kennedy informed Nearing that there was no reason why he should marry Lulu Prince and that, besides, he was engaged to marry another woman. He left Mr. Nearing's office, went out into the hall, and there met C. W. Prince and Will Prince, and the defendant. On that morning before going to Nearing's office Will Prince had oiled up his pistol and put it in his pocket. C. W. Prince and Will Prince told Kennedy that unless he married the defendant at once he would be a dead man in five minutes. He then went with the defendant, her father and brother,

to the recorder's office for a marriage license, which he procured, and he and defendant then went before Judge Gibson and were married, through threats of violence to deceased by her father and brother. The parties then left the courthouse, Mr. Kennedy returning to the office where he worked. That evening Kennedy visited the Prince household, but slept at his own home, as he continued to do up to the time he was killed. So far as the evidence discloses he did not see the defendant again up to the time of the homicide. In a conversation with defendant Mr. Bullene asked her what was the cause of the forced marriage, and she informed him that it was because Kennedy had been engaged to marry her and was about to marry another woman. He asked her if there had been any intimacy between them and she replied that there had not. He asked her why it was that she wanted to marry a man who wanted to marry another girl and she replied that "she wanted her revenge." A day or two before, she called on the city editor of the Star, Captain Wade Mountfort, and asked him to publish the marriage license. She said that Kennedy had been forced to marry her because he had tried to jilt her and she said that she wanted him to get some notoriety and that she wanted him roasted. On the Saturday evening following the marriage, the defendant and Will Prince called again at the Star office, saw Mountfort, and requested that an article be published in the Star to the effect that the marriage had been brought about by the fact that Kennedy was about to marry another girl after having been engaged to Lulu Prince. Will Prince stated in the defendant's presence that the marriage was a forced marriage, but that he didn't want that fact published, as it would annul it; and he further stated that there never had been any intimacy between the defendant and Kennedy. It was finally proposed by Mountfort that Bullene accompany Prince and his sister to Kennedy's house to verify their story, and in response to this sug-

gestion Prince assented saying, "I have had one round with that fellow, I gave him his choice of marrying the girl or going to hell, and he chose to marry her." He called Kennedy a puppy and a coward and other offensive names, and said that he did not deserve to live. Will Prince, the defendant, and Bullene started on the street car for the Kennedy house, and on the way out Will Prince and the defendant proposed to Bullene that he call Kennedy out on the porch, while he and the defendant stand around the corner of the house. This Bullene refused to do and Prince and his sister remained in the street while Bullene entered the house and had a conversation with Kennedy.

From the day of the forced marriage, December 4th, up to the day of the killing, January 10, 1901, Will Prince, Bert Prince and C. W. Prince had conversations with several parties in which covert threats besides those already mentioned were made against Kennedy and statements made in reference to the relations between him and the defendant, her father and brothers. Four or five days after the forced marriage, R. J. Costello, deputy recorder, who issued the marriage license, met C. W. Prince and asked him how the couple were getting along. C. W. Prince said that the young lady was at home with him. Costello replied that it would only be a question of time until Kennedy got a divorce, and C. W. Prince said, "I would like to see him get a divorce, he is dealing with the old man now and he isn't so old he couldn't take care of himself." About a week or ten days before the killing Costello again met Prince on the street car and asked him again how they, the defendant and deceased, were getting along, and C. W. Prince replied that Kennedy wasn't doing the right thing, to which Costello replied, "That boy will never live with your daughter," and C. W. Prince answered him by saying: "He had better do the right thing, or the papers will have something to write about."

On the evening of January 8, 1901, Kennedy filed in the circuit court of Jackson county a petition seeking to annul the marriage into which he had been forced to enter.

The filing of this suit was published in the morning and evening papers of the 9th, but the summons was never served. About 4:30 on the evening of January 9th, Will Prince was seen walking around on the second floor of the new Ridge building, at and near the place where on the evening of the next day the killing took place. The same evening the defendant was also seen in the new Ridge building on the stairway between the second and third floor, from which place one could see into the office in which Kennedy was employed. That evening between five and six o'clock the defendant met Steve O'Grady, a newspaper reporter on the Kansas City World, at Ricksecker's cigar store, at Ninth and Walnut, where she was waiting for a telephone message from some one, or else trying to call some one by telephone. She had a conversation with O'Grady, an acquaintance, and in this conversation O'Grady asked her what was the cause of the forced marriage, if she and Kennedy had been intimate. She said there had been no intimacy between them, but that Kennedy had been going with her and was about to marry another girl, and that she "had beat her to it, or had beat her time." O'Grady asked her what she was going to do about the annulment suit and she answered "that her time would come to get even, or to get her revenge." He asked her if it would be soon and she said it would.

On January 10th, Bert, Will and C. W. Prince left home at different times in the morning. Bert went to the new Ridge building some time between eight and eleven o'clock on that morning. Will returned home at the noon hour and ate lunch with his sister. They left the house together or else joined each other shortly after and were seen walking together west on Eleventh street, between Park and Olive. When about midway between

these streets Will handed the defendant something which she retained. At Eleventh and Brooklyn the defendant got on an electric car, and as she did so her brother made some remark to her to which she replied, "All right." This occurred about three o'clock. Will went direct to his father's pool hall in the Exchange building, to which place defendant came shortly afterwards. She went into the pool hall and had a conversation with her father and her two brothers, Bert and Will. After which she and Will went out into the hall and held a conversation for fifteen or twenty minutes, after which she left. At about 4:30 o'clock Bert appeared at the Fire Department headquarters on the east side of Walnut street, between Eighth and Ninth, one block north of the Ridge building. He left there, going south, across Ninth street, in the direction of the Ridge building. Between 4:30 and 5 o'clock he and the defendant were seen engaged in conversation in the hallway of the Ridge building on the third floor. They separated, she going to Dr. Cross's office in the Rialto building, a block and a half east, while Bert took the elevator on the third floor, riding to the first floor, and went out of the Main street entrance. Sometime between 4:30 and 5 o'clock the defendant called at Dr. Cross's office and told him she was not Mrs. Case Patten, whom she had represented herself to be on her previous visits, but that her name was Mrs. Kennedy; that the story she told him on the occasion of her last visit to the effect that she had gotten rid of her child by an abortion was not true, and that she was still in a pregnant condition. She requested the doctor to go to Mr. Kennedy's office, and tell him that she was in the same condition that she had been in. The doctor at first refused to go, and said that he would telephone Mr. Kennedy to come to his office. He did telephone to Mr. Kennedy, but Kennedy informed him that he could not leave his office until after six o'clock. The defendant again requested the doctor to go and see Mr. Kennedy and

urged him to do so, saying that it would be a great favor, as the papers in the annulment suit would be served that night, and then she added: "My father will make me fight this suit and every thing will come out." She also said in urging the doctor to go and see Kennedy, "I am afraid my father and brothers will hurt him." "I don't remember which she said, harm or shoot him, or do some damage to him." He asked her what was the great hurry of having the matter attended to that night, and she replied that "the papers will be served to-night, and it must be attended to this evening." The defendant was in and out of the Doctor's office three times that afternoon, and after he consented to go, she left, and he, after attending to some matters at his office, followed. It was about 45 minutes after her first call that the Doctor started from his office in the Rialto building for the Ridge building. He entered the Ridge building at the Walnut street entrance, which is on a level with the third floor of the new Ridge building, and walked through the hall to the stairway leading from the third floor down to the second floor on which floor Mr. Kennedy worked. He met the defendant at the top of the stairs on the third floor, and stopped and conversed with her a moment. She said to him, "You go down and see him, and then I will come down." She, however, preceded Dr. Cross down the stairway and stepped back into the corridor towards the east, so she couldn't be seen from the entrance of the office of the Merchants Dispatch Transportation Company. Dr. Cross came down the stairs, went to the door of the office and asked for Mr. Kennedy, who was called to the door by Roland Butler, and he (Kennedy) stepped out into the hall. As Mr. Kennedy stepped out in the hall he was addressed by Dr. Cross, and just then Roland Butler, who was looking through a crack in the door noticed the defendant approach Mr. Kennedy and Dr. Cross, unbuttoning her jacket. When she saw Butler she stepped back. Dr. Cross told Mr. Kennedy

what the defendant had requested him to tell him and just then the defendant stepped up to them. She said to Mr. Kennedy, "Wait a minute, I want to talk to you." Kennedy replied, "I haven't got anything to say to you." She then said, "Are you going to live with me?" and he answered, "No." While these questions were being asked and answered, Dr. Cross turned to the south to go towards the elevator. Kennedy and the defendant had moved away a few steps east in the hall. Dr. Cross had gone not over ten feet when he heard the report of a revolver. When the defendant began to shoot, Kennedy turned towards the west and started for the door of the office, the defendant continuing to fire very fast. Tom Kennedy, the brother of the deceased, and Roland Butler, the stenographer, rushed out of the office as quickly as possible. Tom Kennedy grabbed the defendant just as she fired the last shot, and they fell to the floor, she uttering a scream as they fell. Just as Tom Kennedy grabbed Mrs. Kennedy he was struck from behind a blow by Will Prince, who appeared immediately upon the scene of the tragedy. Tom Kennedy sprang to his feet and grappled with Will Prince and with the assistance of two others, who had rushed out of the office, pushed him against the wall. Prince said to Tom Kennedy, "Who in the hell are you?" and Kennedy answered, "Yes, who in the hell are you?" to which Prince answered by saying, "I thought you were striking a lady." The defendant then turned to the three men who were holding Will Prince struggling to get away, and said, "Turn that man loose, it was I who did the shooting." No sign of recognition passed between the defendant and her brother. Prince was then released, as he was not recognized at the time, and left his hat, which had fallen off in the scrimmage, and ran up stairs to the third floor, down the hall, and out the Walnut street entrance. Kennedy got just inside the office, uttering the words,

Vol 177 mo—8

"It wasn't her gun that did it," and fell dead.   He had been hit six times, the number of shots fired.   One of the shots entered from the front of his body, one from the side, two in the back, one pierced his ear, and the other struck his forehead. .

J. J. Mountjoy was standing in the east and west hallway on the third floor about thirty feet east of and facing the stairway leading from the third to the second floor at the time his attention was attracted to the shooting, and saw Will Prince struggling with those who were holding him, when he reached the top of the stairs on the third floor.   Tomlinson and Kincaid, who were in a printing office within a few feet of the door, about fifty feet east of the place of the killing rushed out into the hall on hearing the reports of the pistol and saw Will Prince moving in a westerly direction towards Tom Kennedy.

The defendant stated in conversation with the police matron, Mrs. Patti Moore, after the shooting, that she went to the Ridge building to talk to the deceased; that he refused to talk to her, pushed or brushed her aside, and that she lost her temper and shot him.   The defendant was visited that evening at the police station by her father and brother Bert.   Will Prince claimed his hat when it was identified at the coroner's inquest. Before the defendant was seen by her father and brother she told Mrs. Moore that she was afraid her father would not speak to her, but when her father and Bert came to the police matron's room they and the defendant greeted each other pleasantly, conversed in low tones and laughed and smiled while talking.   Her manner and appearance at the police station where she remained from Thursday evening to Saturday afternoon was cool and collected, and it was shown by the testimony of Mrs. Moore, who was the mother of eleven children, that the defendant suffered no miscarriage while in her charge, and showed no signs or symptoms of pregnancy.   It was shown by the testimony of Dr.

Boarman, the jail physician, who saw the defendant almost daily from January 12th to June 12th, that she suffered no miscarriage while in the county jail, and showed no signs or symptoms of pregnancy. This was in substance the case in chief made by the State. The defendant did not take the stand in her own behalf.

The evidence upon the part of the defense tended to show that Kennedy began paying attention to defendant about two years before the homicide, and under promise of marriage he debauched her, from the illicit intercourse between them she became pregnant, and that he had her go away but she returned. This was during the year 1899, but that thereafter early in the year 1900, he began to treat her with indifference, in consequence of which she became very sad, low-spirited, and cried a great deal. Upon investigation by her father he learned from her that Kennedy had maintained criminal relations with her under promise of marriage. Her father and brother Will Prince then compelled Kennedy, by threats of violence, to marry her, but he refused to live with her, and in a few days brought suit against her for an annulment of the marriage. She asked him to live with her if only for a short time until she could live her trouble down, and then was willing to let him obtain a divorce if he desired. This he refused to do. She continued to become more moody and worried. On Saturday, January 5th, she went down town. She came home and went to her room. When she was called for supper she did not respond. A servant went to her room and found her on the bed crying. In about half an hour the servant went back and found her very sick. A doctor was called who described her condition as follows: "She was ill and restless and complained of having lost sleep, with dilated pupils. Her appearance was unusual; it was an unusual appearance." She was confined to her bed until Tuesday; meanwhile a suit for

divorce had been filed by Mr. Kennedy. She came home about noon, went into the kitchen, laid her head upon the table, commenced crying and cried for half an hour. That night she was unable to sleep, and talked of Kennedy and his wrong to her. The next morning she did not get up early, and remained around home until after luncheon. She then dressed and went down town.

Learning of this suit she went to the office of Dr. Cross, and, while she had stated to him on a former occasion that she was Mrs. Case Patten and thought she was pregnant, she stated to him that this was not so, that she was Mrs. Kennedy and wanted him to tell Kennedy that she said she was in the same condition that she had been all the time. On the day of the homicide and a few minutes before it occurred, she was in Dr. Cross's office, and at her request he went to see Kennedy for her, when the homicide occurred as before stated.

Other facts will be hereafter stated in course of the opinion.

The court instructed for murder in the first and second degrees and manslaughter in the fourth degree.

I shall not undertake in this opinion to call attention to the many errors with which this record abounds, nor, to say that defendant is not guilty, under the facts and law, of some criminal offense, but I shall try to satisfy the unbiased mind, however enormous the crime with which defendant stands charged, that she did not have a fair and impartial trial, but was manifestly convicted in utter disregard in many respects of the law in regard to criminal prosecutions.

In the first place, notwithstanding the statute (sec. 2627, R. S. 1899) provides that after the jury is impaneled and sworn, "the prosecuting attorney *must* state the case and offer the evidence in support of the prosecution; second, the defendant or his counsel may then state his defense and offer evidence in support thereof; third, the parties may then respectively offer

rebutting testimony," the prosecuting attorney was permitted to make two statements, an opening statement, and a reply statement to the statement in behalf of the defendant, and, in the latter, over the objection and exception of defendant, was permitted to make an assault upon defendant's character, and to state, "If evidence in support of the contention suggested by defendant's counsel is brought before you, the State in rebuttal will introduce along two lines: first will relate to the character and reputation of the defendant, a line of investigation unpleasant to those connected with criminal prosecutions. . . . In reference to the first branch of rebuttal testimony to which I have referred it will be shown in evidence by reputable people that in the *years prior* to the time when the defendant in this case came into the life of the deceased, her reputation, her conduct and her course of life were such that she couldn't have been led by him aside from the path of virtue."

There had been no statement that defendant would be placed upon the witness stand to testify in her own behalf, nor was she, but even if she had been, unless she first put her character in issue by offering evidence of her good character, the prosecution could not have attacked it; "the reason being that such evidence is too likely to move the jury to condemnation irrespective of his actual guilt of the offense charged." [3 Greenleaf on Evidence (16 Ed.), sec. 14, b; State v. Lapage, 57 N. H. 289-296; People v. Sharp, 107 N. Y. 427.] Citations are hardly necessary for support of this fundamental rule. These statements, made as they were with the approbation of the court, could but have led the jury to believe they were true, and were just as prejudicial as if they had been proven, and could but have from the very inception of the trial imbued the jury with the idea that defendant was for years prior to the time she formed the acquaintance of deceased of bad reputation for chastity. This of itself is sufficient to reverse this case.

It is said that the court erred in permitting the introduction of testimony on the part of the State, for the purpose of showing a conspiracy between defendant, her father and brothers to kill Kennedy, they not being included in the indictment, and no such an averment contained therein. There is some conflict among the authorities upon this question. For instance, Mr. Wharton in his work on Criminal Evidence (9 Ed.), sec. 700, says: "It makes no difference as to the admissibility of the act or declaration of a conspirator against a defendant, whether the former be indicted or not, or tried or not, with the latter; for the making one a co-defendant does not make his acts or declarations any more evidence against another than they were before; the principle upon which they are admissible at all being that the act or declaration of one is the act or declaration of all united in one common design, a principle which is wholly unaffected by the consideration of their being jointly indicted."

The same rule seems to be announced in Bishop's New Criminal Procedure, secs. 1248, 1249; 3 Greenleaf on Evidence (13 Ed.), sec. 92.

On the other hand, it was held in State v. Carroll, 31 La. Ann. 860, that the conversations of an accused, on trial for murder, after the alleged killing, with a person jointly indicted for the murder, are not admissible in evidence when the indictment does not charge conspiracy. The court observed: "It is too elementary to require reasoning, that if the indictment did not charge a conspiracy, the conversations were not admissible." While we are constrained to hold in accordance with the rule announced by Mr. Wharton, we do so very reluctantly, for certainly the better practice is, to make all of the conspirators parties defendant to the indictment, or to aver therein the existence of such conspiracy, the parties thereto if known, and their purpose, for then the defendant upon trial will have reason to anticipate what evidence will, or may be, offered

against him, and to prepare to meet the same; otherwise he will not.

A conspiracy is a combination by two or more persons to do a thing criminal or unlawful in itself, and may be proven by facts and circumstances, if sufficient, and when shown to have existed, then the statements and acts of each of the conspirators made or done in pursuance of the common design may be proven against the others upon a prosecution against them for the commission of the crime, but nothing said or done by them after the crime has been accomplished is admissible. But to justify the admission of such evidence, the proof must show prima facie in the first place in the opinion of the judge that the conspiracy existed, and thereafter the question of the actual existence of such conspiracy submitted to the jury. [State v. Walker, 98 Mo. 95; State v. McGee, 81 Iowa 17, and authorities cited.]

It will not be contended that the evidence did not show a conspiracy between defendant, her father and brothers to compel Kennedy to marry defendant, and to kill him if he refused to do so, nor that there was not a conspiracy between defendant and her brother William to kill him if he refused to live with her after such marriage, nor that the homicide was not committed in pursuance of the conspiracy with William; hence, his acts and statements with respect thereto after such conspiracy was formed, up to and at the time of the homicide with respect thereto, were admissible in evidence against her. But I contend that there was no such conspiracy as this last one either expressed or implied between defendant, her father and her brother Bert Prince, or between defendant and either of them, and that, therefore, their statements and acts, whatever they may have been, were inadmissible in evidence against her. To establish the conspiracy between defendant, her father, C. W. Prince, and Will Prince, the State was permitted to show by one Fred S. Bullene, a newspaper reporter, that he was in the recorder's office when

Kennedy, defendant, her father, and her brother Will Prince came in, and he thought Kennedy asked for a marriage license; that the clerk started to issue it when Kennedy got up and started to come over where witness was; that he had a pen in his hand and started to take notes. That as he started towards witness, C. W. Prince stepped up in between Kennedy and himself, and with a motion of his hands to his side either touched him or Kennedy, shoving them apart. That C. W. Prince then said: ''No you don't; this isn't over yet.' That Kennedy then said, ''All right.'' Witness then testified to the facts attending the ceremony of marriage.

The objection to the admission in evidence of these statements by Bullene was upon the grounds ''that it was incompetent, irrelevant and immaterial,'' but the objection was overruled and exceptions saved. But whether the objection was specific enough or not, the remark of C. W. Prince, ''No you don't, this isn't over yet,'' had no reference whatever to anything other than the marriage, and can not be tortured into anything tending to show a conspiracy between defendant and him and defendant's brother Will, to kill Kennedy if he did not live with defendant after he was married to her. The preliminary steps to the marriage were then being arranged, and the expression and acts of C. W. Prince could not by any fair construction have had reference to anything else.

Another circumstance relied upon as tending to show a conspiracy between defendant and her father to kill Kennedy was that after the marriage he presented a bill to Kennedy for $40 for one month's board of his wife, which Kennedy refused to pay, and upon being asked by defendant's father, ''Are you going to pay it?'' and deceased said, ''No,'' to which the father replied, ''I will show you what a low-down son-of-a-bitch you are; you don't deserve to live.'' Defendant was not present at the time of this controversy, nor is

it pretended that she knew anything about the bill, or its presentation, or that she was in anywise concerned in it, and the conversation between Kennedy and C. W. Prince with respect thereto was clearly inadmissible against defendant; nor did the remark of C. W. Prince to Kennedy have any tendency to show a conspiracy between him and defendant to kill Kennedy, or even a threat by C. W. Prince to do so himself.

Still another circumstance relied upon by the State as tending to show a conspiracy between defendant, her father, and her two brothers was that on the evening of the killing and shortly prior thereto, Will Prince went to his father's pool room where defendant soon joined him, and that she, her father and two brothers had a conversation, after which *she* and *Will* went into the hall and held a few minutes conversation in which a witness stated, ''They seemed to be very much interested,'' after which, some where between 3:30 and four o'clock, she left. There was no evidence of any whispered conversation as claimed by the State between defendant and Will, nor as to what the conversation was about. But it will scarcely be contended, even if it were proven that defendant and her father and brothers were engaged in a private conversation, that such an occurrence is unusual between persons occupying such a relation, or that it could be inferred therefrom that they were conspiring to kill Kennedy. These and other facts not tending in any way to show that C. W. Prince and Bert Prince had conspired with defendant to kill Kennedy, was the basis for the admission in evidence against defendant of the statement of Bert Prince, when reading an account of the suit in an evening paper by Kennedy against defendant for annulment of the marriage, ''that was a shotgun wedding, and you will read something a good deal worse than that;'' and of other statements made by him, and also of the statement of a witness for the State by the name of Costello, who testified that on the evening of the homicide and just

after it occurred he met C. W. Prince at the entrance to the Ridge building, and spoke to him; that about that time somebody came running out of the building and said there was a woman up there shooting her husband, whereupon witness said to Prince, "That is your daughter up there shooting that fellow Kennedy, her husband," to which Prince replied: "That is who it is, keep still."

When the evidence of this last witness was offered it was objected to by counsel for defendant upon the grounds that it was "incompetent, irrelevant, immaterial; there is no charge of any conspiracy in the indictment; it is not part of the *res gestae*, and there had not been any evidence of any nature tending to show a conspiracy." The court observed: "The question of conspiracy is a question of fact, that is of course left to the jury; is isn't necessary for the indictment to charge a conspiracy in order for it to be proven. . . . It isn't offered by the State as a part of the *res gestae*. The question for the jury is whether a conspiracy is proven or not. I will overrule the objection." Defendant saved exception. As there was no conspiracy shown to exist, as we contend, between defendant, her father and Bert Prince, or between her and either of them to kill Kennedy, it was error to admit the statements made by them or of their acts at any time with respect to the homicide in evidence against her. If the evidence showed them to be guilty of any connection with the homicide, it was that of accessory or principals, but certainly not as conspirators. It was upon the theory alone that they had conspired to take the life of Kennedy that the testimony with respect to the statements and acts of C. W. and Bert Prince were admissible, which tended to show that the homicide was committed with malice and deliberation, and defendant guilty of murder in the first degree, when but for such evidence defendant might have been found guilty of manslaughter, hence, prejudicial to her.

But the conversation between C. W. Prince and this witness was inadmissible even though C. W. Prince was a conspirator to the homicide, because Kennedy had then been killed and the conspiracy, if there ever was one, ended, and anything said by Prince thereafter with respect to the homicide was inadmissible as evidence against the defendant. [3 Greenleaf on Evidence (16 Ed.), sec. 94.] It was not offered as *res gestae.*

The State was permitted to introduce, over the objection and exception of defendant, evidence in chief that in the summer of 1900, one Case Patten, a *professional baseball player,* came to Kansas City as one of the pitchers on the local team, and that he and defendant soon thereafter became acquainted, and that he called upon her a few times at her home, that she called for him on several occasions where he boarded, that they walked together on the streets, and were out riding together upon one occasion. That she wore his gold watch and chain during the summer of 1900, and she loaned him her diamond ring, which he wore. That in the latter part of September or the early part of October, the defendant called to see Case Patten at his boarding house one evening and arrangements were made that Patten should call at her home on the next morning and return to her her ring. This Patten did not do, as he got out of town that night without letting the defendant or her family know of his departure. On the 15th of October the defendant went to the police station in Kansas City and stated to Andy O'Hare, a city detective, that Case Patten had left Kansas City with a diamond ring belonging to her, and requested that a letter be written to the chief of police of Westport, New York, where Patten lived, requesting that the ring be secured and returned. In defendant's presence the following letter was written by Mr. Hickman, the secretary of the chief:

"Kansas City, Mo., Oct. 15, 1900.
"Chief of Police, Westport, N. Y.

"Dear Sir: Miss Lulu Prince called at my office this morning and reported that last July she loaned a small diamond ring to Case Patten, who was a ball player with our local club the last year, and that he left for his home (which is your city) Saturday night, taking the ring with him. Will you kindly see Mr. Patten and get the ring and express it to me?

"Thanking you in advance, I am, very truly," etc.

That the defendant called at the police station at police headquarters to inquire in reference to this matter, and finally, no reply having been received, she told O'Hare that she was going to Westport, New York, and see Patten and get her ring. O'Hare asked her the value of the ring and when the defendant told him it was worth about $20 he suggested to her that it would be cheaper to let him keep it. That the defendant replied that she intended to go and see Patten and get the ring back even if it cost her several times its value. That she left the city for Westport, New York, her brother Will knowing of her departure and the reason of it. That he tried to dissuade her from the trip, and offered to buy her another ring, but she refused the offer. That shortly after her return she met O'Hare, showed him a ring and told him she had been to Westport, New York, and had seen Patten and had recovered the ring.

The admission of this evidence, if it be entitled to be called such, is attempted to be justified upon the ground that it was competent to go to the jury to disabuse their minds of the belief that the mind of defendant had been deranged by brooding over the faithlessness of deceased; that it showed that deceased was not a suitor, but had been a visitor, and that during the summer of 1900 the defendant was the constant associate of another young man, Case Patten, to whom she had loaned her ring; that she was wearing his watch,

was seeking his company, and made a trip to New York to get her ring. That it was entirely competent to prove her acts and statements to show she was perfectly rational; that her conduct was that of a sane, and not that of an insane person, as the defendant intimated she was. But this position is absolutely untenable, for the record shows that it was not offered for any such purpose, but was offered for the sole purpose of besmirching defendant's character. It was introduced in chief, when it could not properly have been introduced under any circumstances otherwise than in rebuttal of evidence offered by defendant as to good character [State v. Gabriel, 88 Mo. 631; State v. Creson, 38 Mo. 372; Whar. on Crim. Evi. (8 Ed.), secs. 62, 63; People v. Bodine, 1 Denio 281], and as defendant did not testify there was nothing to rebut.

Great stress was placed upon the fact that Case Patten was a professional baseball player, both in the opening statement of the prosecuting attorney to the jury, and throughout the trial. For instance, the following is a sample of the questions that were permitted to be asked over the objection and exception of defendant:

"Q. I will ask you to state if you saw the defendant and Case Patten, *this baseball pitcher,* together in the summer and fall of 1900? A. I have, walking up and down Olive street."

And as if to make that fact more prominent and, by innuendo, that he was a disreputable character, the court took it upon itself to ask a witness for the State the following questions:

"He played with a professional baseball team?"

Witness: "Yes, sir."

The Court: "They went on trips sometimes?"

Witness: "Yes, sir."

The Court: "Did he play on Manning's team here?"

Witness: "Yes, sir. They went out in Kansas for a trip."

Can it be thought for a moment that, if it had been some gentleman of high character, who was engaged in any unquestionable business, any such questions would have been asked the witness? The question furnishes its own answer. These facts threw no light whatever upon the homicide, for certainly defendant's flirtation with Patten could not, and did not furnish a motive for the homicide, and no one will so contend, so that, it must follow, they were inadmissible for any purpose.

Moreover, when the facts connected with this episode are considered in connection with the testimony of Dr. Cross, hereafter discussed, also introduced in chief by the prosecution, that she was pregnant by Patten, it is apparent that the purpose was to assault defendant's private character by proving specific acts, and by innuendoes, which was clearly erroneous and prejudicial. But it is said the facts connected with the Patten episode were properly admitted in evidence to prove her acts and statements to show she was perfectly rational; that her conduct was that of a sane and not an insane person as the defendant insisted she was. But there is not one word in this immense record of over six hundred and fifty typewritten pages which tends to show that it was introduced or admitted in evidence for any such purpose, nor was it, but that it was admitted for the sole purpose of showing defendant to be guilty of unchaste conduct, and to attack her character by specific acts of immorality and as the associate of a disreputable person, clearly appears.

The facts with respect to defendant's association and connection with Case Patten, and everything connected therewith and growing out of it, had nothing whatever to do with the homicide, either directly or indirectly, and threw no light upon it, nor the condition of defendant's mind at the time of the homicide, and were not, as it seems to us, within the range of legitimate inquiry, but were even beyond what might be

properly called the boundary line of even the shadow of evidence, and were improperly admitted and prejudicial to defendant.

. So with respect to the contents of the petition for the annulment of the marriage which counsel for the State say in their brief was read to the jury. They were nothing more than the statements of deceased, which were not competent evidence for any purpose or from any standpoint, and no more so than if the statements had been merely verbal, which no one will seriously contend would have been permissible.

It is also said that the court erred in permitting Dr. Cross, a physician who prescribed for defendant, to testify over her objections to statements made to him during that time. The following occurred:

"Q. Before you proceed to that, did you make an examination? A. Yes, sir.

"Q. Did she give you a history of her condition? A. Simply a history that led me to believe.

"Q. What did she say?

"Mr. Nearing: Wait a minute; we object to that as incompetent and privileged conversation.

"The Court: You are asking what the defendant said?

"Mr. Hadley: Yes, sir.

"The Court: Overruled.

"Q. I will ask you to state to the court whether or not she made any statement to you on the occasion of the third visit, whether or not she was then in a pregnant condition?

"Mr. Nearing: Objected to as incompetent, irrelevant and immaterial, and privileged communication.

"The Court: That isn't necessarily privileged communication.

"The Court: I will ask you the question, you can save your exception to it: When she came to you did she call for treatment for any purpose with reference to her pregnancy?

"Mr. Nearing: Objected to as incompetent, irrelevant and immaterial and privileged communication.

"The witness: I can't say; she asked treatment for sleeplessness, but not for pregnancy.

"The Court: You may state whether at that time she said she was pregnant or not.

"Mr. Nearing: Objected to as incompetent and immaterial and privileged communication.

"The witness: I asked her if she was all right otherwise; she said all right.

"Mr. Nearing: Exception, and ask that it be stricken out for the same reason.

"The Court: Overruled.

"Mr. Nearing: Exception.

"Mr. Hadley: Answer the question.

"The witness: I understood from her she was not.

"Mr. Hadley: Not what?

"The witness: Pregnant.

"Mr. Woodson: We move to strike it out.

"The Court: Strike out what?

"Mr. Woodson: He asked her if she was all right otherwise, and she said, yes, sir.

"The Court: I am ruling it is not privileged for her to say whether she was pregnant or not; I hold that is not a privileged communication.

"Mr. Woodson: Exception.

"The Court: That is a communication that may be made to anybody.

"Mr. Woodson: Exception.

"Q. I will ask you to state to the jury whether or not she told you about having been treated—about having had an abortion performed by another physician in the city.

"Mr. Nearing: Objected to as incompetent, irrelevant, immaterial and privileged communication.

"The Court: Objection overruled.

"Mr. Nearing: Exception.

"Q. The statement made to you on the occasion of her third visit, namely, that she wasn't in a pregnant condition, was it true or not true?

"Mr. Nearing: We object to that.

"The Court: Overruled; tell what she said.

"Mr. Nearing: Exception."

It will be observed that no exceptions were saved to the action of the court in overruling a number of objections to questions propounded to this witness, but beginning with the question propounded by the court and beginning with the following language, "I will ask you the question, you can save your exceptions," and from that on the objections were timely made and exceptions duly saved.

Section 4659, Revised Statutes 1899, provides that "a physician or surgeon shall be incompetent to testify, concerning any information which he may have acquired from any patient while attending him in a professional character, and which information was necessary to enable him to prescribe for such patient as a physician, or do any act for him as a surgeon."

We take it that the physician or surgeon must, as a general rule, under the statute, determine for himself whether the information acquired by him from his patient is necessary for him to prescribe for such patient, and in the absence of some showing to the contrary, as in the case at bar, the presumption must be indulged that the information in question was necessary for that purpose; otherwise, he would not desire it. To rule otherwise would be to usurp the prerogative of a physician, learned in his profession, which we have no inclination or right to do. We, of course, do not mean to say that we will not pass upon questions which are apparent to the ordinary observer, and to one not learned in the sciences of medicine and surgery which have nothing whatever to do with the case under consideration, and hold them not privileged.

In Gartside v. Conn. Mutual Life Ins. Co., 76 Mo. 446, it is said: "Not only the statements from the patient, but the information obtained through his observation or examination while attending the patient in a professional capacity, are privileged."

In the case of Edington v. Mutual Life Ins. Co., 67 N. Y. 194, the court said: "The statute is very explicit in forbidding a physician from disclosing any information received by him which is necessary to enable him to prescribe for a patient under his charge. It is a just and useful enactment, intended to give protection to those who were in charge of physicians from the secrets disclosed to enable them to properly prescribe for diseases of the patient. To open the door to the disclosure of secrets revealed on the sick bed, or when consulting a physician, would destroy confidence between the physician and the patient, and, it is easy to see, might tend very much to prevent the advantages and benefits which flow from the confidential relationship. The point made, that there was no evidence that the information asked for was essential to enable the physician to prescribe is not well taken, as it must be assumed from the relationship existing that the information would not have been imparted except for the purpose of aiding the physician in prescribing for the patient. Aside, however, from this, the statute in question being remedial, should receive a liberal interpretation, and not be restricted by any technical rule."

No error was committed by the exclusion of the evidence of the witnesses for defendant, Lewis and Kuhn, unless what they testified to was part of the *res gestae* (State v. Curtis, 70 Mo. 594; State v. Nocton, 121 Mo. 537; State v. Punshon, 124 Mo. 457; State v. Fitzgerald, 130 Mo. 407; State v. Bauerle, 145 Mo. 1), and we do not think it was.

While the authorities all hold that "it is for the court, in the first place, to say whether there is any

evidence of a conspiracy, and for the jury to determine whether there was one, and its objects'' (State v. Walker, 98 Mo. 95; State v. McGee, 81 Iowa 17; 2 Thompson on Trials, sec. 2455), and the court so announced from the bench; the case was tried by the State upon the theory that there was a conspiracy between defendant, her father, and brothers, Bert and Will Prince, to force the deceased to marry her, and to kill him if he did not do so and thereafter live with her, and the case is so presented in this court, yet the trial court ignored this theory of the case in the instructions; in fact, did not say one word about a conspiracy, but usurped the province of the jury in that regard, regardless of the law governing the case.

In State v. McGee, supra, it is said: ''The rule is as to a conspiracy, to justify such evidence, that the proof must show prima facie, in the opinion of the judge, its existence. [1 Greenl., Ev., sec. 111; Rosc. Crim. Ev. (7 Amer. Ed. 1874), secs. 417, 418; State v. George, 7 Ired. 321; Card v. State, 9 N. E. (Ind.) 591.] The question of the sufficiency of such proof is one peculiarly for the determination of the trial court. [Card v. State, supra.] It should be borne in mind that the question of the actual existence of a conspiracy is one to be finally submitted to the jury, and that the finding or conclusion of the trial judge is only a basis for the admission of evidence.''

The court should have instructed the jury in effect as was done in Hardin v. State, 4 Tex. App. 355, that is, if they believe from the evidence that the State has proven a conspiracy between the defendant, her father and brothers, or with any of them acting with her, to force Kennedy to marry her, and to take his life if he refused to do so, and to live with her thereafter, and that she and her father and brothers, or any of them, acting with her, did so force Kennedy to marry her, and did so take the life of Kennedy because he thereafter refused to live with her, then in considering the guilt

or innocence of the defendant, you may take into consideration every act and declaration of each member of the confederacy, in pursuance of the original concerted plan, and with reference to the common object, which has been given in evidence before you. [2 Thompson on Trials, sec. 2455.]

As the court announced from the bench that "the question of conspiracy is one of fact the jury has to decide," and of its own volition instructed them it was wholly unnecessary for defendant to ask it to instruct on the question of conspiracy, or, after the instructions were read, to call its attention to the fact that it had failed to do so, because it can not under such circumstances be presumed that it was an oversight that it did not do so. As to whether or not there was a conspiracy between defendant and others to kill Kennedy was a question to be found in the affirmative by the jury before the statements and acts of the conspirators could be considered in evidence against defendant, and the court should have so instructed the jury, whether asked to do so or not (sec. 2627, R. S. 1899), and in failing to so do committed error.

For these intimations the judgment should be reversed and the cause remanded. *Fox, J.,* concurs; *Gantt, P. J.,* dissents.

DISSENTING OPINION.

GANTT, P. J.—The defendant was indicted by the grand jury of Jackson county, at the February term, 1901, for the murder of her husband, Phillip H. Kennedy, on the 10th day of January, 1901.

The cause was tried at the succeeding April term of said court, and resulted in a verdict of guilty of murder in the second degree, on the 18th day of June, 1901. A large number of witnesses testified and the transcript includes more than six hundred pages.

An extended and detailed statement of the facts in evidence is essential to an understanding of the various

propositions urged by defendant for a reversal of the judgment and sentence. As gleaned from the mass, the following is an abstract of the facts proven:

Lulu Prince Kennedy, the defendant, was about twenty-three years old at the time of the murder. She had been a stenographer for about three years, having been employed in a number of different offices in Kansas City. She lived with her parents near Olive and Peery avenue, and her two brothers, Charles William, commonly called "Will," and Albert Prince, commonly called "Bert," a professional mandolin player, who claimed to have returned in the December prior to the killing from a trip around the world, also resided at the same place. The defendant's father conducted a pool room in the Exchange building at Eighth and Central. The deceased, Phillip H. Kennedy, who was about thirty years of age, had been employed for a number of years as a clerk and solicitor by the Merchants' Dispatch Transportation Company, with offices on the second floor of the new Ridge building, situated on the east side of Main street between Ninth and Tenth. He lived with his father and mother, brother and sister, at 2305 Troost avenue. The defendant and the deceased had been acquainted for about two years prior to the killing, and in the latter part of 1899 and the early part of 1900 the deceased called on the defendant frequently at her home and at the place where she worked. In the month of April, 1900, Will, the brother of the defendant, noticed the attentions of the deceased to the defendant, went to him, and asked him if his intentions were serious. On being answered in the negative, Will Prince requested Mr. Kennedy to cease calling on his sister, and after that time the evidence discloses that they were together but twice until the 4th day of December, 1900. In the summer of 1900, Case Patten, a professional baseball player, came to Kansas City as one of the pitchers on the local team, and he and the defendant soon became acquainted with each other. She called frequently

at the place where he roomed and he called on her at her home, taking her riding and walking, and was seen frequently in her company. He gave her his gold watch and chain which she carried during the summer of 1900, and she loaned him a diamond ring which he wore. These intimate relations apparently continued through the summer of 1900 and up until the close of the baseball season. In the latter part of September or the early part of October, the defendant called to see Case Patten at his boarding house one evening and arrangements were made that Patten should call at her home on the next morning and return to her her ring. This Patten did not do, as he got out of town that night without letting the defendant or her family know of his departure. On the 15th of October the defendant went to the police station in Kansas City and explained to Andy O'Hare, a city detective, that Case Patten had left Kansas City with a diamond ring belonging to her, and requested that a letter be written to the chief of police of Westport, New York, where Patten lived, requesting that the ring be secured and returned. In defendant's presence the following letter was written by Mr. Hickman, the secretary of the chief:

"Kansas City, Mo., Oct. 15, 1900.
"Chief of Police, Westport, N. Y.

"Dear Sir: Miss Lulu Prince called at my office this morning and reported that last July she loaned a small diamond ring to Case Patten, who was a ball player with our local club the last year, and that he left for his home (which is your city) Saturday night, taking the ring with him. Will you kindly see Mr. Patten and get the ring and express it to me?

"Thanking you in advance, I am, very truly," etc.

The defendant called at the police station at police headquarters to inquire in reference to this matter, and finally, no reply having been received, she told O'Hare that she was going to Westport, New York, and see Patten and get her ring. O'Hare asked her the value

of the ring, and when the defendant told him it was worth about $20, he suggested to her that it would be cheaper to let him keep it. The defendant replied that she intended to go and see Patten and get the ring back if it cost her several times its value. She left the city for Westport, New York, her brother Will knowing of her departure and the reason of it. He tried to dissuade her from the trip and offered to buy her another ring, but she refused the offer. Shortly after her return she met O'Hare, showed him a ring, and told him she had been to Westport, New York, and had seen Patten and had recovered the ring. About the last of October or during the first week in November, the defendant went to the office of Dr. Cross, in the Rialto building at Ninth and Grand avenue, and told him that she was the wife of Case Patten, the baseball player; that she was in a pregnant condition and wanted him to perform an abortion on her, as her husband would lose his position if it was known that he was a married man. Dr. Cross refused to perform the abortion and she left. The doctor made no examination of the defendant by which her pregnancy could be determined, taking her statement on that matter as true. Some time after the first part of December she called again on Dr. Cross and continued to represent herself as Mrs. Case Patten, and informed him that she had had an abortion performed upon her by another physician and asked him for some treatment for nervousness. The doctor gave her a prescription for a simple nerve sedative. Dr. Cross was not acquainted with the deceased. He did not see the defendant again until the day of the killing.

On December 4, 1900, the deceased was called by telephone, while in his office in the Ridge building, and asked to go at once to the office of Charles H. Nearing, a member of the bar in the Nelson building at Missouri avenue and Main street, on important business. Mr. Kennedy went to Mr. Nearing's office, and was there in-

formed by Mr. Nearing that he would have to marry Lulu Prince or her father would kill him. Mr. Kennedy informed Mr. Nearing that there was no reason why he should marry Lulu Prince and that, besides, he was engaged to marry another woman. He left Mr. Nearing's office, went into the hall, and there met C. W. Prince and Will Prince and the defendant. On that morning before going to Nearing's office Will Prince had oiled up his pistol and put it in his pocket. C. W. Prince and Will Prince told Kennedy that unless he married the defendant at once he would be a dead man in five minutes. At this his courage failed him and he went with the defendant, her father and brother to the recorder's office for a marriage license. While sitting at the table in the recorder's office waiting for a deputy to make out the license, Mr. Kennedy saw Fred Bullene, court reporter for the Kansas City Star, and, apparently recognizing him, got up from his chair and started towards him. C. W. Prince stepped between them and with his left hand, his right remaining significantly in his overcoat pocket, pushed them apart and ordered Kennedy to go back and sit down, remarking, "This thing is not over yet." While in the recorder's office Will Prince and C. W. Prince kept their hands apparently on their pistols in their overcoat pockets. After Kennedy's futile effort to communicate with Bullene he made no further effort to escape, but went resignedly to Judge Gibson's chambers where a marriage ceremony was performed. The parties then left the courthouse, Mr. Kennedy returning to the office where he worked. That evening Kennedy visited the Prince household, but slept at his own home, as he continued to do up to the time he was killed. So far as the evidence discloses he did not see the defendant again up to the time of the murder. On the Saturday following the Tuesday on which the marriage ceremony was performed the defendant went to the county courthouse and saw Mr. Bullene, the reporter

for the Kansas City Star, for the purpose of having another article written in addition to the one that had been published, giving the bare facts of the marriage. In the conversation that ensued Mr. Bullene asked the defendant what was the cause of the forced marriage, and she informed him that it was because Kennedy had been engaged to marry her and was about to marry another woman. He asked her if there had been any intimacy between them, and she replied that there had not. He asked her why it was that she wanted to marry a man who wanted to marry another girl, and she replied that "she wanted her revenge." A day or two before, she called on the city editor of the Star, Captain Wade Mountfort, and asked him to publish the marriage license. She said that Kennedy had been forced to marry her because he had tried to jilt her, and she said that she wanted him to get some notoriety, and that she wanted him roasted. On the Saturday evening following the marriage the defendant and Will Prince called again at the Star office, saw Bullene and Mountfort, and requested that an article be published in the Star to the effect that the marriage had been brought about by the fact that Kennedy was about to marry another girl after having been engaged to Lulu Prince. Will Prince stated in the defendant's presence that the marriage was a forced marriage, but that he didn't want that fact published, as it would annul it; and he further stated that there never had been any intimacy between the defendant and Kennedy. It was finally proposed by Mountfort that Bullene accompany Prince and his sister to Kennedy's house to verify their story and in response to this suggestion Prince assented, saying, "I have had one round with that fellow, I gave him his choice of marrying the girl or going to hell, and he chose to marry her." He was very bitter against Kennedy in his conversation, calling him a puppy and a coward and other offensive names and said that he did not deserve to live. Will

Prince, the defendant and Bullene started on the street car for the Kennedy house, and on the way out Will Prince and the defendant proposed to Bullene that he call Kennedy out on the porch, while he and the defendant stand around the corner of the house. This Bullene refused to do, and Prince and his sister remained in the street, while Bullene entered the house and had a conversation with Kennedy, in which Kennedy denied that he had ever been engaged to marry Lulu Prince, and said that he was engaged to marry another woman. He also told Bullene the circumstances of the forced marriage as they have been stated above, and this conversation Bullene repeated to the defendant and Will Prince when he rejoined them after leaving the house. No publication was made as a result of the visit.

From the day of the forced marriage, December 4th, up to the day of the killing, January 10, 1901, Will Prince, Bert Prince and C. W. Prince had conversations with several parties in which covert threats besides those already mentioned were made against Kennedy, and statements made in reference to the relations between him and the defendant, her father and brothers. Four or five days after the forced marriage, R. J. Costello, deputy recorder, who issued the marriage license, met C. W. Prince, and asked him how the couple were getting along. C. W. Prince said that the young lady was at home with him. Costello replied that it would only be a question of time until Kennedy got a divorce, and C. W. Prince said, ''I would like to see him get a divorce; he is dealing with the old man now, and he isn't so old he couldn't take care of himself.'' About a week or ten days before the killing Costello again met Prince on the street car and asked him again how they, the defendant and deceased, were getting along, and C. W. Prince replied that Kennedy wasn't doing the right thing, to which Costello replied, ''That boy will never live with your daughter,'' and

C. W. Prince answered him by saying, ''He had better do the right thing or the papers will have something to write about.''

One evening about two or three weeks after the ceremony, C. W. Prince met Edward J. Curtin, a shoe salesman, in a drugstore in Kansas City, and Curtin said to him: ''Mr. Prince, what is this I hear you are doing.'' Prince said, ''I am not going to let any son-of-a-bitch jilt my daughter.'' Then, apparently thinking that Curtin was Bullene, as they resembled each other, Prince said, ''You were there, weren't you, Mr. Bullene?'' Curtin nodded to this, and then Prince said to him, ''That was a pretty good story, and if things don't go right you will get a good deal better story than that.'' He was excited and mad and when Curtin asked him if the couple were living together Prince answered, ''No, and he would see that they didn't live together.'' Curtin also heard somebody in the drugstore say to Prince that Kennedy would try to get a divorce from his daughter, and Prince replied, ''Let the son-of-a-bitch try it; he is dealing with the old man now, not the girl.'' On the morning after the forced marriage Will Prince in conversation with Jack Caldwell, a machinist with whom he had some business connections, said in speaking of the circumstances of the forced marriage after the ceremony had been performed, ''I remarked to him, Kennedy, that he had prolonged his life three weeks by doing what he had done.'' He also stated to Caldwell that Kennedy had been going with his sister and was about to marry another woman, and so they called him down to Mr. Nearing's office, met him when he came out, and took him to the courthouse and made him get a license and get married. At another time Caldwell asked Will Prince if Kennedy was living with his sister, and Will Prince answered him by saying, ''It is an immaterial fact whether he does or not; he has crossed his Rubicon long ago.''

On the 1st of January C. W. Prince sent Phillip Kennedy by a messenger boy the following bill, to which Kennedy did not reply:

"C. W. PRINCE,
"Exchange Pool Hall, 717 Central.
"Kansas City, Mo., Dec. 31, 1900.
"Mr. Phillip H. Kennedy, Dr. to C. W. Prince.
"To one month's board and maintenance of your
    wife . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $40 00
    "Please remit.                    C. W. PRINCE."

On the envelope were the following indorsements: "Return in five days to C. W. Prince, Exchange Pool Hall, 717 Central street, Kansas City, Mo. [Addressed] Phillip H. Kennedy, care Merchants' Dispatch, Ridge Building, Kansas City, Mo."

On the evening of January 3d, at about six o'clock and just after Mr. Nash and Mr. Portens, the only two men connected with the office in which Kennedy was employed, had left, C. W. Prince and Will Prince, with their hands again suggestively in their overcoat pockets, appeared at the door of the office and inquired for Mr. Kennedy of Roland Butler, a boy employed there as a stenographer. They stepped in the office and asked Kennedy if he had received the bill they had sent him. Mr. Kennedy replied that he had. C. W. Prince said, "Are you going to pay it?" and Mr. Kennedy said, "No." Mr. Prince said, "You refuse to pay it?" and Mr. Kennedy said, "Yes, you can sue me for maintenance, I am acting under advice of counsel." Mr. Prince then said to Mr. Kennedy, "I will show you what a low-down son-of-a-bitch you are, you don't deserve to live." At that remark, by reason of some movement on the part of Will Prince or C. W. Prince, Kennedy ran for the door. Will and C. W. Prince tried to intercept him at the door, but Kennedy got out into the hall pursued by Will Prince, Butler having grabbed C. W. Prince around the waist and holding him back. When Kennedy got to a flight of stairs leading from the sec-

ond to the first floor he was either struck down stairs by Will Prince who was following, or else slipped and fell. He cried for help, and then Will turned and ran back to his father and called out to him to "come out this way." C. W. Prince tore himself loose from Butler, and the two men ran up stairs to the third floor, and down the hall to the Walnut street entrance. Kennedy, with the blood streaming down his face from a cut over the eye, found a policeman who returned with him to the Ridge building. The State offered evidence to the effect that on Monday following, the first day Kennedy was able to get out of the house after the assault on the evening of the third, he sought and secured an order for a peace warrant against C. W. Prince and Will Prince from C. E. Burnham, assistant prosecuting attorney. This evidence the court excluded on the objection of the defendant. On the day after this assault was made Will Prince told Jack Caldwell how Kennedy had dived downstairs from "under the shadow of a gun," and said that "he was the most immaculate coward Christ ever died to save."

On the evening of January 8, 1901, Kennedy filed in the circuit court of Jackson county a petition seeking to annul the marriage in which he had been forced to enter, which was never served.

The filing of this suit was published in the morning and evening papers of the ninth, but the summons was never served. About 4:30 on the evening of January 9th, Will Prince was seen walking around on the second floor of the new Ridge building at and near the place where on the evening of the next day the killing took place. He was apparently studying "the lay of the ground." The same evening the defendant was also seen in the new Ridge building on the stairway between the second and third floor, from which place one could see into the office in which Kennedy was employed. That evening between five and six o'clock the defendant met Steve O'Grady, a newspaper re-

porter on the Kansas City World, at Ricksecker's cigar store at Ninth and Walnut, where she was waiting for a telephone message from some one or else trying to call some one by telephone. She had a conversation with O'Grady (with whom she had chanced to become acquainted while employed as a stenographer at the Home Product Show in Convention Hall the first week in October), and in this conversation O'Grady asked her what was the cause of the forced marriage, if she and Kennedy had been intimate. She said there had been no intimacy between them, but that Kennedy had been going with her and was about to marry another girl, and that she "had beat her to it or had beat her time." O'Grady asked her what she was going to do about the annulment suit and she answered, "That her time would come to get even or to get her revenge." He asked her if it would be soon and she said it would. He asked her if it would be by a proceeding in court, and to this question she made no reply.

The same night Bert Prince was in a saloon on the Southwest boulevard, and started a conversation with a bartender, whom he noticed reading an account of the annulment suit in the evening paper. He said, pointing to the article, "That was a shotgun wedding, and you will read something a good deal worse than that." He seemed to be angry, and called Kennedy a son-of-a-bitch.

On January 10th, Bert, Will and C. W. Prince left home at different times in the morning. Bert went to the new Ridge building, apparently to look over the ground, as Will had done the night before, and his presence there at some time between eight and eleven o'clock on the morning of the tenth was testified to by one of defendant's witnesses. Will returned home at the noon hour and ate lunch with his sister. They left the house together or else joined each other shortly after, for the two were seen walking close together, west on Eleventh street, between Park and Olive. When

about midway between these streets Will handed the defendant something, which she retained, apparently covered with a pocket handkerchief. At Eleventh and Brooklyn the defendant got onto an electric car, and as she did so her brother made some remark to her to which she replied, "All right." This occurred about three o'clock. Will went direct to his father's pool hall in the Exchange building, to which place defendant came shortly afterwards. She went into the pool hall and had a conversation with her father and her two brothers, Bert and Will. After which she and Will went out into the hall, and held an earnest conversation for fifteen or twenty minutes, after which she left. This was somewhere between 3:30 and 4 o'clock. At about 4:30 o'clock Bert appeared at the Fire Department headquarters on the east side of Walnut street, between Eighth and Ninth, one block north of the Ridge building. He left there, going south, across Ninth street, in the direction of the Ridge building. Between 4:30 and 5 o'clock he and the defendant were seen engaged in close conversation in the hallway of the Ridge building on the third floor. They separated, she going to Dr. Cross's office in the Rialto building, a block and a half east, while Bert took the elevator on the third floor, riding to the first floor, and went out at the Main street entrance. While going down the elevator he was asked by an acquaintance if he was going to play that night, and he answered that he was not. He apparently returned to his father's pool hall, and with his companions furnished some music for the patrons of the place. Some time between 4:30 and 5 o'clock, the defendant called at Dr. Cross's office and told him she was not Mrs. Case Patten, whom she had represented herself to be on her previous visits, but that her name was Mrs. Kennedy; that the story she told him on the occasion of her last visit to the effect that she had gotten rid of her child by an abortion was not true, and that she was still in a preg-

nant condition.  She requested the doctor to go to Mr. Kennedy's office, and tell him that she was in the same condition that she had been in.  The doctor at first refused to go, and said that he would telephone to Mr. Kennedy to come to his office.  He did telephone to Mr. Kennedy, but Kennedy informed him that he could not leave his office until after six o'clock.  The defendant again requested the doctor to go and see Mr. Kennedy and urged him to do so, saying that it would be a great favor, as the papers in the annulment suit would be served that night, and then she added:  "My father will make me fight this suit, and everything will come out."  She also said in urging the doctor to go and see Kennedy, "I am afraid my father and brothers will hurt him."  "I don't remember," the doctor continues in his testimony, "which she said, harm or shoot him, or do some damage to him."  He asked her what was the great hurry of having the matter attended to that night, and she replied that "the papers will be served to-night, and it must be attended to this evening."  The defendant was in and out of the Doctor's office three times that afternoon, and after the Doctor consented to go, she left, and he, after attending to some matters at his office, followed.  It was about forty-five minutes after her first call that the Doctor started from his office in the Rialto building for the Ridge building.  He entered the Ridge building at the Walnut street entrance, which is on a level with the third floor of the new Ridge building, and walked through the hall to the stairway leading from the third floor down to the second floor on which floor Mr. Kennedy worked.  He met the defendant at the top of the stairs on the third floor, and stopped and conversed with her a moment.  She said to him, "You go down and see him, and then I will come down."  She, however, preceded Dr. Cross down the stairway and stepped back into the corridor towards the east, so she couldn't be seen from the entrance of the office of the Merchants' Dispatch Trans-

portation Company.  Dr. Cross came down the stairs, went to the door of the office and asked for Mr. Kennedy, who was called to the door by Roland Butler, and he (Kennedy) stepped out into the hall.  As Mr. Kennedy stepped out in the hall he was addressed by Dr. Cross, and just then Roland Butler, who was looking through a crack in the door, noticed the defendant approach Mr. Kennedy and Dr. Cross, unbuttoning her jacket.  When she saw Butler she stepped back.  Dr. Cross told Mr. Kennedy what the defendant had requested him to tell, and just then the defendant stepped up to them.  She said to Mr. Kennedy, ''Wait a minute, I want to talk to you.''  Kennedy replied, ''I haven't got anything to say to you.''  She then said, ''Are you going to live with me?'' and he answered, ''No.''  While these questions were being asked and answered, Dr. Cross turned to the south to go towards the elevator, and Kennedy and the defendant had moved away a few steps east in the hall.  Dr. Cross had gone not over ten feet when he heard the report of the revolver.  When the defendant began to shoot, Kennedy turned towards the west and started for the door of the office, the defendant continuing to fire very fast.  Tom Kennedy, the brother of the deceased, who had called at the office to protect his brother each evening after the assault of January 3, and Roland Butler, the stenographer, rushed out of the office as quickly as possible, passing Kennedy staggering towards the door.  Tom Kennedy grabbed the defendant just as she fired the last shot, and they fell to the floor, she uttering a scream as they fell.  Just as Tom grabbed Mrs. Kennedy he was struck from behind a vicious blow by Will Prince, who appeared immediately, as if he had been in waiting, upon the scene of the tragedy. Tom Kennedy sprang to his feet and grappled with Will Prince and with the assistance of two others, who had rushed out of the office, pushed him against the

wall.   Prince said to Tom Kennedy, "Who in the hell
are you?" and Tom answered, "Yes, who in the hell
are you?" to which Prince answered by saying, "I
thought you were striking a lady." The defendant
then turned to the three men who were holding Will
Prince struggling to get away, and said cooly: "Turn
that man loose, it was I who did the shooting." No
sign of recognition passed between the defendant and
her brother.   Prince was then released as he was not
recognized at the time, and left his hat, which had fallen
off in the scrimmage, and ran up stairs to the third floor,
down the hall, and out at the Walnut street entrance.
Kennedy, who was staggering towards the office door
when his brother and Roland Butler rushed past him,
got inside the office, turned in his death throes, and
uttering the words, "It wasn't her gun that did it," fell
dead in the hall.   He had been hit six times, the num-
ber of shots fired.   One of the shots entered from the
front of his body, one from the side, two in the back,
one pierced his ear and the other struck his forehead.
Either of the body wounds were mortal.

Before Kennedy fell to the floor Will Prince ap-
peared upon the scene.   Where he came from no one
seems to know.   He had probably stationed himself
in the hallway on the second floor to the east of the
stairway or on the landing of the stairway, between
the second and third floors.   J. J. Mountjoy, the head
janitor of the building, was standing in the east and
west hallway on the third floor about thirty feet east of
and facing the stairway, leading from the third to the
second floor, at the time his attention was attracted by
the shooting.   He testified positively that no one was in
the hallway on the third floor between him and the stair-
way.   That he ran to and down the stairway, and that
no one passed down the stairway in advance of him.
Mountjoy saw Will Prince struggling with those who
were holding him, when he reached the top of the stairs
on the third floor.   Dr. Cross didn't see Prince coming

down the stairway, and Tomlinson and Kincaid, who were in a printing office within a few feet of the door, about fifty feet east of the place of the killing, rushed out in the hallway on hearing the reports of the pistol and saw Will Prince moving in a westerly direction towards Tom Kennedy and the defendant. At the time Mountjoy heard the firing he had just looked at a regulated clock in the window of a jewelry store on the third floor of the Ridge building, and it was exactly seventeen minutes to six o'clock by that clock when the shooting took place. Two parties went for an officer immediately after the shooting, one riding down the elevator, and the other running down the stairs. They found Officer Crane going south on Main street about ten feet to the north of the entrance of the Ridge building. He ran at once into the building, took the elevator, which was waiting, and was carried to the second floor. Officer Anderson was standing on the west side of Main street across from the Ridge building, and seeing officer Crane running into the building he followed on a run, going upstairs to the second floor. Crane had just arrested the defendant when Anderson arrived. Crane told him to call the ambulance and officer Anderson stepped into the Merchants' Dispatch Transportation office, secured prompt telephone connections with the police station, called for the ambulance, the call being received at fifteen minutes to six o'clock by the regulated clock at the police station. It was shown in evidence that all that was done in the calling of the officers and their arriving upon the scene and the calling of the patrol could easily be done in less than two minutes. The police ambulance responded at once to the call and arrived at the Ridge building in about four minutes after the call was received, as was shown by subsequent tests. Before officer Crane arrived the defendant had been held by the wrist by Tom Kennedy. A physician in the building, who had been attracted by the shooting, knelt down by the side of Kennedy's body,

placed his ear to his breast, and hearing no heart beat, the physician raised his head and said, "He is dead." The defendant stepped up and asked, "Is he dead?" and the doctor answered, "He is dead." The defendant then kicked the deceased in the face and said, "He will never seduce another girl." Her manner was cool and collected. When officer Crane arrived he took hold of the defendant by the wrist, and she said to him, "Turn my hands loose, officer, I want to fix my hair." When the officer let loose of her hands she said, "I am not going to run away." The officer remained but a moment, less than two minutes, was his testimony, until he started with the defendant for the station. They walked down the stairs at her request, and when they got on the first floor she requested the officer to walk ahead of her and let her follow. This the officer refused to do. He also asked her who it was she had killed, and she said it was her husband. He asked her what she did it for, and she said, "I can't tell you now." He asked her her name, and she refused to give it. This was after they got to the ground floor. They went out of the door and turned north on Main street. Between the entrance of the Ridge building and Ninth street the defendant kept looking back, and when they got in front of the Sheidley building at the southwest corner of Ninth street, she turned clear around, facing the south, as if looking for some one, and the officer said to her, "Are you looking for some one?" and she answered evasively, "It doesn't seem to create much excitement, does it?" They went on north to the police station, passing the ambulance going south on a run near Sixth and Main. The defendant was taken to the station and placed in charge of the police matron.

At twenty minutes to six Bert Prince went into Jenkins's music store, about fifty feet south of the entrance of the Ridge building, went behind the counter, as was his custom, and left his mandolin. One of the clerks, on account of the change in the closing hour of

the store, looked at his watch and said to Bert, "It is now twenty minutes to six, and you had better not leave your mandolin, if you want to use it again to-night." Bert replied, "I won't need it to-night," and went out, turning to the north towards the entrance of the Ridge building. Two women, who had an office at the south end of the north and south hall on the third floor of the Ridge building, heard the shooting, and, together with a gentleman friend, ran at once to the stairway leading from the third floor to the second floor. When they got there Bert Prince was leaning over the banister looking down upon the scene of the tragedy. The three, the two women and the man, went down to the landing of the stairs, between the second and third floors, and saw the defendant kick the deceased in the face, saw the officer take the defendant away, and then at once went back to the third floor. Bert was still there, and in response to an inquiry by one of the women, with whom he was acquainted, as to who had done the shooting, Bert said, "Why it was Lou; she fixed him; she gave him all that was coming to him. He didn't treat her right." Bert was smiling. R. J. Costello, the deputy county recorder before mentioned, had left a barber shop on Ninth street, between Main and Walnut, at about twenty-five minutes to six by his watch. He walked west on Ninth street to Main, south on Main to the entrance of the new Ridge building, at which place he met C. W. Prince, who was standing there and seemed to be excited. He stopped and spoke to Prince for a moment, and while he was talking a man ran out of the entrance of the building and said there was a woman up-stairs shooting her husband. Costello said, "That is your daughter up there, shooting Kennedy, her husband," and he said, "That's who it is." Costello then said, "Prince, this is some of your work, you could have prevented this if you had wanted to." Prince said to Costello, "Keep still." He then went into the building, and Costello saw him start up-stairs

to the second floor. Shortly after the policeman came down with the defendant, and in from five to seven minutes after Costello had met Prince, the ambulance arrived. There was no crowd in front of the Ridge building, only the ordinary travel passing to and fro on the sidewalk when Costello first met Prince, but the crowd quickly gathered. Just about the time the ambulance arrived another party saw Prince come out of the entrance of the Ridge building, and as the driver of the ambulance drove up he saw Prince come out of the door without his hat, look up and down the street, and then disappear in the crowd. It was shown in evidence that before 5:30 o'clock Will Prince was noticed sitting on the arm chair in his father's pool hall, intently looking at the clock on the wall.

It was contended by the defendant that Will Prince went from the scene of the tragedy to his father's pool hall, knocked on the window, called his father out, told him of the killing, and then his father went back into the pool hall through the Exchange building, and out at the south entrance of the Exchange building, down Eighth street to the Ridge building, meeting Bert Prince in the Exchange building, and that the two went over to the Ridge building together. Some witnesses gave testimony to support this theory, but it appeared beyond dispute that Will left the pool hall a little before 5:30 o'clock, Bert a few minutes later, and it appeared from the evidence of several witnesses called by the defendant that somebody knocked on the window of the pool hall; that it was too dark out on the walk to see who it was; that C. W. Prince at once got his coat and hat, went to his desk, got his pistol, went out at the side door of the pool hall on Central street, and did not return. It appeared in evidence that it took over six minutes to go from the second floor of the Ridge building over the course traveled by Will Prince to the Central street entrance of the pool hall, and that it took four and one-half minutes to go from the pool hall to the west entrance

of the Ridge building. Bert Prince admitted owning the pistol with which the defendant shot her husband.

The defendant stated in conversation with the police matron, Mrs. Paul Moore, after the shooting, that she went to the Ridge building to talk to the deceased; that he refused to talk to her, pushed or brushed her aside, and that she lost her temper and shot him. The defendant was visited that evening at the police station by her father and Bert, but Will discreetly failed to make his appearance, and did not claim his hat until it was identified at the coroner's inquest. Before the defendant was seen by her father and brother she told Mrs. Moore that she was afraid her father would not speak to her, but when her father and Bert came to the police matron's room they and the defendant greeted each other pleasantly, conversed in low tones and laughed and smiled while talking. Her manner and appearance at the police station where she remained from Thursday evening to Saturday afternoon was cool and collected, and it was shown by the testimony of Mrs. Moore, who was the mother of eleven children, that the defendant suffered no miscarriage while in her charge, and showed no signs or symptoms of pregnancy. It was shown by the testimony of Dr. Boarman, the jail physician, who saw the defendant almost daily from January 12th to June 12th, that she suffered no miscarriage while in the county jail, and showed no signs or symptoms of pregnancy. This was in substance the case in chief made by the State.

The defense interposed was, as has been stated, insanity—hysterical insanity. The contention of the State that the defendant's father and brother conspired with her and aided and abetted her in the murder was denied, and evidence was offered to establish an alibi for Bert and C. W. Prince, and Will's presence at the time of the killing was explained on the theory that he was a "victim of circumstances." Defendant's attorneys stated in their opening statement that her rela-

tions with Case Patten and her trip to New York for
the alleged purpose of securing her ring, and her pass-
ing under the name of Mrs. Case Patten, and her visits
to Dr. Cross would all be explained in such a manner
as to convince the jury that these facts had nothing to
do with the killing, and that the sole cause of the kill-
ing was that she had been wronged by Kennedy and,
distressed in mind by this fact, she had lost her ability
to distinguish between right and wrong as to that par-
ticular act, and while in this condition of mind had shot
him.

The defendant did not testify in her own behalf,
nor did her father, C. W. Prince, Sr., but on the trial
she offered in evidence statements made by deceased to
Edward W. Lewis and Arthur Kuhn tending to prove
that deceased had seduced the defendant and then re-
fused to marry her. It was not asserted that these dec-
larations of deceased were part of the *res gestae*. Af-
ter the offer was made the State objected to it as incom-
petent, because the deceased was not a party to the rec-
ord, and the admissions and statements were not a part
of the *res gestae,* and the court sustained the objections
and defendant excepted.

Outside of the declaration made by defendant in
the Ridge building after she had been told that Ken-
nedy was dead and at the same time she kicked his dead
body, that, ''He would never seduce another girl,'' there
was no evidence that Kennedy had seduced and abstan-
doned her. Other evidence for defendant was as fol-
lows:

*W. C. Michaels* and *Sidney F. Woody,* two unmar-
ried men, testified that they had roomed at the Prince
house at 1516 East Fifteenth street from August, 1898,
to April, 1899, and during that period Kennedy called
frequently to see the defendant; that she was then em-
ployed as a stenographer in a down-town office. Woody
met her twice on the street after the forced marriage,
and testified that she looked worried. Michaels also tes-

tified that during the winter of '98 and '99, Kennedy, with whom he was acquainted, was taking the regular course in the Kansas City Law School, in addition to his work as solicitor for the Merchants' Dispatch Transportation Company.

*R. S. Swaggar* testified that in the early spring of 1900 he was guarding the Prince home as a smallpox guard, and during the time that he was there, twenty-five days, the deceased communicated, by letter, frequently with the defendant.

*H. H. Allen, Thomas Field* and *Edwin R. Marvin* testified that the defendant worked as a stenographer in the office with which they were connected, which was visited by a large number of people daily, from February, 1899, and up to the 1st of December, 1899, and that during that period the deceased called frequently at the office during the noon hour to see the defendant. Mr. Field and Mr. Marvin were unmarried men.

*Judge Gibson* of the circuit court was called to the stand and told of his performing the marriage ceremony between the deceased and defendant, and stated that when the deceased stood up to be married he kept his hat on, and that he was asked to remove it. He was asked the question: ''No information came to you at the time you performed this ceremony as to what had occurred in the recorder's office?'' He answered it, ''No, sir; or I wouldn't have performed it.''

*Mrs. Rebecca Walker* stated that she visited in the neighborhood where the Princes lived in September, 1900; that she saw the defendant and thought she ''acted rather strange.'' That on several occasions she saw her walking down the street as if she seemed to be thinking about something and all at once she picked up her dress and ran as though somebody was after her. Mrs. Walker was the only witness who testified to such performances.

*Mrs. Sarah Fillean,* and her husband, *E. A. Fillean,* portrait artist, testified that they were at the Prince

house the night of or the night before the shooting and they both testified that at that time the defendant was quite uncommunicative; that she sat a great deal with her head down and that she went out into the dining room and ate an apple.

*Mrs. Nellie Taylor,* a domestic employed in the Prince family, testified that she had worked at the house from 1898 until November, 1899; that during that time Kennedy called frequently at the house; she returned to work for the Prince family in May, 1900, and that she saw Kennedy but once after that, as one of the Princes forbade him to come there. She testified on cross-examination that Case Patten called at the Prince home to see the defendant during the summer of 1900, and that the defendant called on Case Patten at his boarding house; that Case Patten had a small diamond ring belonging to the defendant, and that she and the defendant went to see Patten in regard to the ring one evening and the next morning he was to bring the ring to her house, but instead of doing so he left town; that this occurred early in October. The witness also testified that the defendant carried a gold watch which belonged to Case Patten, during the summer of 1900 and during the time that he had her ring; witness also testified that the defendant did not sleep well during the week prior to the killing; that she had choking spells in which she would lose consciousness and that she was quiet and sad; that she was sick on Saturday previous to the killing and was attended by Dr. Murphy. Witness stated that she slept with the defendant the night before the killing and that the defendant was nervous; that when she arose the next morning she only drank a cup of coffee for breakfast; that on the day before the killing she was down town to see about a position which she expected to get as a stenographer; that she only drank a cup of coffee or tea for lunch, which she ate with Will Prince, Mrs. Prince and a married sister. That she left her house on the day of the kill-

ing about two o'clock and that Will didn't leave until some time afterwards. The witness further testified that she had gone with the defendant to Dr. Doyle at Fifteenth and Charlotte about the first of the year and that the defendant had got some medicine from him and that she had been with her to see Dr. Doyle frequently. She denied on cross-examination of having testified at the coroner's inquest that on the day of the killing she noticed "nothing in particular about the defendant except that she was sitting in a chair in the back parlor talking with the family." The witness also testified on cross-examination that before the defendant left the house she and Will had a conversation which witness did not hear.

*C. W. Prince, Jr.*, known as Will Prince, testified that he left home on the morning of January 15th and went to Mr. Nearing's office and from there to the circuit court, returned to Mr. Nearing's office and went from there to his home, ate lunch with his sister and that she "hardly ate nothing;" that she left in advance of him, he following some time afterward; that he went down town and went to his father's pool hall, and that the defendant came into the pool hall about four o'clock and that he and the defendant went out in the hall and had a conversation lasting five or ten minutes, and that she then left and he waited for her to return as she said she would; that he didn't know the exact time that he left the pool hall, but that it was after twenty minutes after five; that he went to the Ridge building, third floor, Walnut street entrance; that in going through the hall on the third floor he heard a woman scream; that he "knew it was his sister;" that he rushed down stairs, saw some man apparently choking his sister and ran up and hit him; that he saw it was not Kennedy, the one he thought it was, and apologized; that he lost his hat, and seeing he was a "victim of circumstances," "went up" on the third floor and went out; that he went north on Walnut street to Eighth, west on Eighth five blocks

to Central, north on Central to the west entrance of his father's pool hall, called his father out and told him what his sister had done. In reference to the appearance and conduct of the defendant he stated that prior to the killing he had seen her have "three strangling spells," and that these strangling spells would affect her something as follows: that while talking she would reel and fall and clutch at her throat, and that his mother and the servant would throw water in her face, "seemingly the only thing that would help her." That these three occurred between December 4th and January 10th. He also testified that he noticed that she was despondent and falling off some in flesh. He testified that he knew of the defendant leaving town in October, 1900, to get a ring, and that he tried to dissuade her from going, offering to buy her a ring in the place of the one that Patten had taken. On cross-examination he admitted having taken part in public boxing matches, but did not think that they were professional, as he wasn't connected with the box office; that he had noticed that the defendant was non-communicative in her manner from July, 1899; that in April, 1900, he had inquired of Kennedy if his intentions were serious, and finding they were not, forbade him and the defendant from going with each other, and the defendant had promised him that she would comply with his wishes; he admitted that after his conversation in the hall of the Exchange building with the defendant he had returned to the pool hall, and sat looking at the clock. He admitted that he ran away after he was released at the time of the shooting and did not go back to claim his hat that evening or the next day, as "his attorney told him not to."

*Albert Kimmons*, or *Bert*, *Prince* testified that he came to Kansas City a short time before the holidays; that he left home on the morning of the day of the killing; was around town at different places and went to his father's pool room at about 2 o'clock and remained

there until about 5:30; that when he left the pool hall he went out in the Exchange building into the water closet and remained there for some time and while returning to the pool hall he met his father in the corridor of the Exchange building, and was informed of the killing and together they went over to the Ridge building. That he went up to the second floor and saw Kennedy's body lying on the floor, and then went up to the office of a lady friend on the 4th floor and was refused permission to leave his mandolin, and then went down and left his mandolin at Jenkins's store a few minutes before six, contradicting the testimony of three witnesses who placed him there at twenty minutes before six. He denied that at any time he had any understanding with his sister about killing Mr. Kennedy; he testified that his pistol with which the defendant had shot her husband had been left by him on the dresser in his room on the morning of the killing. He denied having any conversation with a bartender on the Southwest boulevard. On cross-examination he denied being in the Ridge building on the morning of January 10th, as testified to by Tracy Derrick, a witness called by the defendant; he denied having had a conversation with C. J. Dillon on the night of January 10th, in which he said that he had heard of the killing while in the pool hall and had heard of it by telephone; he also denied having been at the fire department headquarters between 4:30 and 5 o'clock as testified to by three witnesses. This witness gave no testimony relating to the conduct, actions and appearance of the defendant.

*Thomas S. Ridge* testified that he was on the fourth floor of the Ridge building at the time of the shooting on the evening of January 10th; that his attention was attracted by the shooting and a woman's screams; that he ran down two flights of stairs to the place of the killing and saw the circumstances that occurred afterwards substantially in accordance with the testimony of the other witnesses. On cross-examination he stated that

it was about a minute after he got there that a police-
man came.

T. J. Noble testified that he officed on the fourth
floor of the Ridge building; that his attention was at-
tracted by the shooting; that he went down to the land-
ing between the second and third floor and that he saw
Will Prince scuffling with two other men; that some-
body seemed to search him for a gun; that he saw an
officer come and that the defendant appeared to be ex-
cited; that after he had been down to the place of the
killing for about five or seven minutes he looked at
his watch and it was then fifteen minutes to six. This
witness also heard the defendant say, when Will Prince
was struggling with those who sought to detain him,
"Turn that man loose; it was I who shot him."

C. F. Bernhart, who was in the same office with No-
ble on the fourth floor of the Ridge building, testified
that his attention was attracted by the shots; that he
went to the place of the killing and saw Will Prince
scuffling with those who were holding him, heard the
defendant say, "Turn that man loose; it was I who
shot him;" that he noticed the appearance of the de-
fendant and that she was excited, "clenched her fists
and her eyes blazed;" this witness also testified that
he returned to his office when the policeman left with the
defendant, and that he looked at his watch and that it
was then fifteen minutes to six.

Miss Clemie Lallmand, a hair-dresser with offices
on the fourth floor of the Ridge building, heard the
report of the pistol, went into the hall, but did not go
to the place of the shooting, returned to her office and
stayed there about fifteen minutes (she fixed the time
by the length of time she thought it took her to do cer-
tain work on a customer), and then went again to the
stairway where she saw Bert Prince with his mandolin,
and was told by him that his sister had shot Kennedy.
She denied that Bert Prince had been in her office on
the morning of the shooting. Tracy Derrick, connected

with Miss Lallmand in the hair-dressing business, heard the shooting, ran to the stairway of the fourth floor and returned to her work, and in a few minutes (the witness thought it was fifteen) heard Bert Prince out in the hall, looked out and saw him with his mandolin in his hand. She fixed the time by the length of time she thought it took her to do some work on a customer. This witness also testified that: "Bert Prince was a friend of mine and Miss Lallmand. He was in the office on the morning of the shooting and Miss Lallmand was there at the time. He remained in the morning about a half an hour and it was somewhere between eight and eleven o'clock that he was in the office."

*George M. Jarvis,* who was engaged in selling fire extinguishers, saw C. W. Prince and Bert Prince on Wall street between Eighth and Ninth, walking south, on the evening of the killing. They passed him on this street. He went on down Wall street to Ninth, east on Ninth to the Stickney cigar store, stopped there and played a slot machine five times, bought a cigar, lighted it, then went out. As he went out of the cigar store east on Ninth to Main and south on Main to the Ridge building he, saw the ambulance in front of the Ridge building. Witness had nothing to fix the time that he saw C. W. and Bert Prince on the street, but thought it was from fifteen to twenty minutes of six.

*Benjamin C. Brock,* engineer at the Exchange building, was in the pool hall on the evening of the killing, saw Bert, C. W. and Will, in the pool room, saw Will leave the pool room some time after five o'clock, thought the music stopped about 5:30, and that Bert left immediately afterwards; saw Will come to the Central street entrance of the pool hall, and tap on the window; saw C. W. Prince go out at the side door, come back and get a coat and two hats, and go out the west entrance of the pool hall. On cross-examination the witness testified that before Will left he had noticed him sitting on the arm of a chair looking intently at

the clock on the wall. He did not want to be certain as to whether Bert left at 5:30 or five minutes before 5:30. He had nothing to fix the time in his mind; he thought it was somewhere near 5:30 that Bert went out at the south door of the pool room through the Exchange building. He saw C. W. and Bert return to the pool hall about five minutes to six; that C. W. left the pool hall a few minutes after Bert left, from two to five minutes, the witness estimated. Witness saw C. W. Prince go to his desk and get something and somebody remarked that the old man was getting his pistol, just before he left. Witness thought it was about twenty-five minutes to six that Bert left the pool hall, and about twenty minutes to six that C. W. left.

*Max Smallberg,* a meat-cutter employed in a saloon adjoining the pool hall, heard the music, and saw Bert, C. W. and Will Prince in the pool hall on the evening of the killing; said the music stopped about 5 o'clock, was in the pool hall after Bert and Will had left, heard a rap at the window on the Central street side of the pool hall about half past five to a quarter of six, but did not see who it was; saw C. W. Prince put on a hat, go outside, come back without a hat, put on his coat and hat and went to his desk and then left. Saw Bert and C. W. Prince return to the pool hall about seven o'clock. He testified on cross-examination that C. W. Prince did not go out at the west entrance of the pool hall, but went out at the south entrance through the Exchange building.

*George A. Brockman* employed in the Prince pool hall as a helper, testified that the music stopped between 5 and 5:30; after the music stopped Bert Prince went out at the south door of the pool hall through the Exchange building; after Bert had left he heard a rap on the window on the Central street entrance, saw Will there bareheaded, saw C. W. Prince go out with his hat on, come back without a hat, put on another hat, and go out at the west door of the pool hall. He testified

that it was about 5:30 that Will Prince rapped on the window.

*R. H. Hall* was in the pool hall on the evening of the day of the shooting; heard the music which was being made by Bert Prince and his accompanist, Guy Daniels; heard a rap on the window, which witness thought occurred about a quarter of six to the best of his recollection, looked out but ''could see no one, as it was so dark I couldn't tell;'' saw C. W. Prince go out at once and immediately return, put on his coat and hat and go out at the west entrance of the pool hall. Witness was closer to the window upon which the rap was made than any other parties in the pool hall, about ten feet away. He testified on cross-examination that Bert had left from a half an hour to an hour prior to the time the rap was heard on the window.

*L. G. Myers*, who was playing pool with R. H. Hall, testified that the music stopped between 4:30 and 5 o'clock, and after the music stopped he did not see Bert Prince any more. Did not see Will leave the pool hall, but heard a knock on the window; looking around he recognized Will Prince on the sidewalk, and did not think he had a hat on. Saw C. W. Prince go outside and come back, get his coat and hat and leave the building; could not say whether he had a hat on the first time he went out or not. On cross-examination the witness testified that it was about 5:30 that Will Prince rapped on the window and C. W. Prince left the pool hall. He further testified that it was pretty dark out on the sidewalk and he would not say whether he had testified before the grand jury that he couldn't recognize who it was who rapped on the window; saw C. W. Prince go to his desk and get something out and heard somebody make the remark that the old man was putting a gun in his pocket; saw the defendant in the pool hall in the afternoon about half past three o'clock. Saw her talking with Will and Bert and he thought C.

Vol 177 mo—11

W. also was in the party.   This question was asked
and answered:

"Q.   It is your recollection that Bert left about
5 o'clock and it was about 5:30 that you heard this rap
on the window and the old gentleman went away?   A.
That was as near as I can recollect."

*Guy Daniels,* who accompanied Bert Prince on the
guitar, testified that he played with Bert at the pool hall
on the afternoon of the killing; that the music continued
until half past five and that he and Bert then went into
the saloon; that he stopped in the saloon and Bert went
on out, through the Exchange building; that Bert left
about five minutes before he did.   On cross-examina-
tion he stated that Will was in the pool room from three
o'clock until about half past five, at which time he left,
and that Bert left a few minutes after Will; that Will
did not leave until Bert was putting on his overcoat
to go.

*Edwin Richter* testified that he was in the pool hall
about half past five and remained there about ten min-
utes and that Bert was playing on his mandolin at that
time.   He did not see Will Prince.

*Orsa Elliott* testified that he heard Bert Prince and
Guy Daniels play some music on the afternoon of the
day of the killing, in the pool hall, and that he left the
building at from a quarter after five to half past five.

*B. F. Barrett* testified that he was in the pool room;
heard the music and saw Mr. Elliott at the time; had
nothing to fix the time that he was in there, but thought
he left about half past five.

*John W. Moore* was in the pool hall on that evening;
heard the music and left the pool hall about half past
five.

*Edwin W. Lewis, Theodore Remley* and *Arthur A.
Kuhn* were called to the witness stand, but were not per-
mitted to testify.

*Dr. Franklin Murphy,* a practicing physician, testi-
fied in behalf of the defendant and stated that on Jan-

uary 5th, Saturday night, he was called to attend the defendant and found her in "rather a nervous condition, restless."

The question was asked, "Was her talk connected or disconnected? A. Well, I couldn't call it disconnected; she manifested some petulance and indisposition to be disturbed.".

This witness further testified that he considered that the defendant was suffering from a "slight indisposition," that she had a small increase in temperature which might come from indigestion; he saw her on Saturday evening, and gave her some mild sedative. and on the Monday following he called at the house on his way to the office before she had gotten out of bed; she called on the doctor at his office that day or the next day and he then dismissed her from his charge. She was in bed about thirty-six hours. On cross-examination the witness was asked this one question and made the one answer:

"Q. I will ask you to tell the jury whether, in your opinion, during those three or four days you saw the defendant, she was sane or insane? A. I think she was not insane."

*Dr. John Punton,* a specialist in nervous and mental diseases, was called as a witness by the defendant. He testified that hysteria is a nervous disease affecting the brain center; that it is considered a mental disease and affects the will power of the individual. This was his examination in chief. On cross-examination he testified that hysteria is largely a functional trouble and in a general way it is a manifestation of a generally recognized female characteristic.

He was asked: "If a person at the time of a homicide should say in a cool and collected manner to bystanders who were holding another person, 'Let that man go; it was I who did the shooting,' would you find in that any manifestation of a hysterical condition?" And he answered, "I don't think so."

"If a person should also state immediately after the commission of a homicide to an officer who was holding her hands, 'I wish you would release my hands, I want to fix my hair; I am not going to run away,' would you find in that statement any manifestation of a hysterical condition?" Answer: "No, sir; I would not."

A number of other questions based upon the actions and remarks of the defendant made immediately following the shooting were suggested to the witness and he answered that he found in them no manifestations of a hysterical condition. The witness further testified that he examined the defendant while she was in jail; that he took her temperature and talked with her for some time. He was asked the question, "What is your opinion as to whether she was sane or insane?" and he answered, "I think she was sane."

The defendant introduced evidence showing that Warren Prince, the grandfather of the defendant, was confined in a hospital for the insane, at the age of seventy-five years, on October 23, 1898, and was sent home with his daughter on April 6, 1899.

Various assignments of error are noted in the brief of defendant's counsel and were urged on the oral argument.

## I.

The first proposition is that the court erred in admitting evidence of a conspiracy between the defendant and her father and two brothers to murder the deceased, without having first charged such conspiracy in the indictment.

In King v. William Stone, 6 Term Reports 527, the prisoner was indicted for treason. The evidence tended to show that the prisoner conspired with John Hurford Stone and William Jackson. The two latter were not indicted, nor was there a charge of conspiracy in the indictment. The evidence of his conspiracy was received.

In Gill v. State, 59 Ark. 422, loc. cit. 430, the court said, ''Nor is it material, as to the admissibility of the acts and declarations of a conspirator against a defendant, whether the former (the conspirator) be indicted or not, nor what the nature of the indictment is, provided the offense involve a conspiracy.'' Citing Wharton's Crim. Ev., sec. 700.

In People v. McKane, 80 Hun l. c. 332, the court said, ''It is not necessary that the co-conspirator, whose acts and declarations in furtherance of the ends of the conspiracy are offered in evidence, should be a party to the record. It is plain that the indictment or non-indictment of the conspirator whose acts and declarations are offered against his fellow, can neither impart any quality of verity or of relevancy to such acts and declarations, nor withdraw it from him, and, hence, his inclusion or exclusion as a party to the indictment is not material.''

That case was subsequently taken to the Court of Appeals and is reported in People v. McKane, 143 N. Y. 455. Judge O'BRIEN wrote the opinion in which all the judges concurred. He said, ''When a conspiracy is shown, or evidence on the subject given sufficient for the jury, then the acts and declarations of the conspirators, in furtherance of its purpose and object are competent, and in a case like this *it is not necessary in order to make such proof competent, that the conspirators should be charged in the indictment.*''

This statement of the law on this point is reiterated by some of our most careful text-writers. [Wharton's Crim. Ev., sec. 700; 1 Greenleaf's Ev., sec. 111; Roscoe's Crim. Ev. (8 Ed.), p. 432; see also, People v. Kief, 126 N. Y. 661; Goins v. State, 46 Ohio St. loc. cit. 463-4.]

In our opinion the point is not tenable. Where the act of conspiring is itself the crime it is essential to charge it in the indictment, but where the conspiracy is merely the common purpose leading up to another dis-

tinct crime, it need not be alleged, nor all the conspirators indicted.

This brings us to the more important objection that conspiracy was not established or sufficiently so to permit the evidence of the acts and threats of her father and brothers against the deceased to be admitted in evidence, to determine whether there was or was not such a conspiracy to murder Phillip Kennedy.

The general rule unquestionably is that the conspiracy must be shown before the acts and declarations of the conspirators other than the defendant on trial can be admitted in evidence, but this rule, wisely formulated for the protection of defendants, is not inflexible. As said in State v. Ross, 29 Mo. loc. cit. 51, "Such acts and declarations are sometimes admitted for the sake of convenience before sufficient proof is given of the conspiracy." [State v. Walker, 98 Mo. 95; State v. Daubert, 42 Mo. 239; People v. Spies, 122 Ill. 238.]

It is a matter largely resting in the discretion of the trial court as to when the proof shall be offered. The prosecution may prove the declarations and acts of one, made and done in the absence of the others, before proving the conspiracy, provided proof is afterward made. [State v. Winner, 17 Kans. 298; Wharton's Crim. Ev. (8 Ed.), sec. 698a; 1 Greenleaf Ev., sec. 111.] It should be further premised that a conspiracy like any other fact may be established by circumstantial evidence, and it is not essential that it should be proven by express agreement or compact between the conspirators or by direct evidence of any agreement. Indeed, from their very nature, conspiracies, like frauds, are usually concocted in secrecy, and can seldom be shown by direct and positive testimony, and this makes it peculiarly necessary to permit them to be established by proof of facts and circumstances tending to show their existence. [U. S. v. Goldberg, 7 Biss. 175; State v. Sterling, 34 Iowa 443; 2 Wharton's Crim. Ev. (9 Ed.), sec. 1398; State v. Walker, 98 Mo. 104.]

With these observations we proceed to the objections urged in this court to the admission of the specific evidence, which it is asserted was error.

*Fred S. Bullene,* a witness for the State, testified that he had resided in Kansas City nearly thirty-seven years, and on the 4th of December, 1900, was at the county courthouse in said city on duty as a reporter for the Kansas City Star newspaper. That he saw defendant, Phillip H. Kennedy the deceased, C. W. Prince the father, and Will Prince the brother, of defendant, all there. It was about 11 o'clock in the morning. He was asked to state what happened and answered: "The persons above mentioned came into the recorder's office where I happened to be at the time. I think Mrs. Kennedy asked for the marriage license; the clerk started to issue it, when Kennedy got up and started to come over where I was; I had a pen in my hand and had started to take notes. As he started towards me, Mr. C. W. Prince, the father, stepped up in between Mr. Kennedy and myself and with a motion of his hands to his side, either touching me or Kennedy, shoving us apart, said—" ["We object to any statement by C. W. Prince as incompetent, irrelevant and immaterial.]"
Q. "Was that in the presence of the defendant?" A. "Yes, sir; in the presence of all of us."

"The Court: I believe I will overrule that objection." Exception.

Thereupon Bullene proceeded to state what the father of defendant, C. W. Prince, then said:

"He said, 'No you don't; this isn't over yet.' Kennedy thereupon said, 'All right,' and sat down in front of the deputy recorder."

The witness then detailed that the parties all went to the private chamber of Judge James Gibson who was trying a case at the time. The Judge was called from the bench and performed a marriage ceremony for defendant and the deceased.

The objection in the form it was made amounted to

no more than saying, ''I object,'' and hence gave no reason why the evidence was not admissible, but it really was not objectionable. One of the four parties whom the reporter saw on that occasion had been shot and killed by another of the party, the defendant in this case, and it was entirely competent to show the relation of these two parties as husband and wife, the obtaining of the license and the circumstances surrounding it.

It was proper for the State to show the jury, who were to determine the guilt or innocence of the defendant, how that marriage came to be solemnized, whether by duress or the free act of the parties to it, and taken in connection with the other evidence in the case, the act of the father at that time in preventing the deceased from communicating with the reporter, was at least very significant. The purpose and purport of Bullene's testimony was to show that deceased had been compelled to go through a marriage ceremony with defendant, and it was perfectly proper to advise the triers of the fact of the relations existing between the defendant and Phillip Kennedy, and the conduct and remark of C. W. Prince made at the time in the presence of both defendant and deceased in connection with the procuring of the license was an inseparable part of that transaction.

Moreover, the testimony of Mr. Mountfort, the city editor of the Star, was that the defendant sought him at his office the next evening and told him that the marriage was a forced one.

This evidence was properly admitted to show the relations of defendant and deceased, and to show, moreover, who were the parties compelling and assisting in enforcing a marriage ceremony.

The same considerations must govern as to the second assignment that the court erred in permitting Bullene to state what defendant said to him the next day when she requested a different article or story to be printed in the Star. The reasons she gave tended to show and further explain the relations and the state of

feeling existing between her and deceased at the time.

The third proposition is that the court erred in admitting the statements of Will Prince made in the presence of defendant, at the Star office, the next evening after the forced marriage, on the ground that there was no charge of conspiracy in the indictment, and none shown.

This objection raises the question how far the testimony tended, at that time and subsequently during the trial, to show a conspiracy to compel deceased to marry and maintain defendant and to kill him if he refused. In this court we must look at the whole evidence to determine this point.

On December 4, 1900, the deceased while attending to his duties in the Ridge building on Walnut street, was called by telephone to go at once to the office of Charles H. Nearing, an attorney in the Nelson building, corner Missouri avenue and Main street, on important business. The deceased went to Nearing's office and was then and there informed by Nearing that he would have to marry Lulu Prince, the defendant, or her father would kill him. Deceased told Nearing there was no reason why he should marry Lulu Prince and that he was engaged to marry another lady. He left Nearing's office, went out into the hall, and there met C. W. Prince, her father, and Will Prince and the defendant. Will Prince had that morning oiled his pistol and put it in his pocket. When deceased encountered these parties in the hall, C. W. Prince, the father, and Will Prince, the brother, told Kennedy, the deceased, that unless he married the defendant at once he would be a dead man in five minutes. Under this threat he accompanied them to the recorder's office, and the marriage ceremony was pronounced. On the following Saturday, the defendant and Will Prince went to the Star office and in defendant's presence Will Prince said the marriage was a forced one, and, upon the suggestion that the paper could not afford to give a different version of the

forced marriage without ascertaining what Kennedy (the deceased) had to say about it, William Prince consented to go out to Kennedy's home, saying, "I have had one round with that fellow, I gave him his choice of marrying the girl or going to hell, and he chose to marry her."

To Jack Caldwell, a machinist, to whom he was talking of the forced marriage, Will Prince said: "I remarked to him (Kennedy) that he had prolonged his life three weeks by doing what he had done." Later on Caldwell inquired of Will Prince if his sister was living with Kennedy, the deceased, and he replied, "It is an immaterial fact whether he does or not; he has crossed his Rubicon long ago."

On the first of January, 1901, some three or four weeks after the forced marriage, the father of defendant sent deceased a board bill for one month's board and maintenance of defendant, $40, to which deceased made no reply. On the evening of the 3rd of January, 1901, about six o'clock in the evening, after all the other employees in the office with deceased had left, except Roland Butler, a boy stenographer, the father, C. W. Prince, and Will Prince, with their hands in their overcoat pockets, appeared at the door of the office and inquired for Kennedy. They stepped in and asked him if he had received the board bill, and he answered that he had. The father then asked, "Are you going to pay it?" and deceased said, "No." Whereupon C. W. Prince said, "You refuse to pay it?" and Kennedy said, "Yes, you can sue me for maintenance; I am acting under the advice of counsel." Whereupon the father said, "I will show you what a low-down s— of a b— you are; you don't deserve to live." At that remark or by reason of some movement of Will Prince, Kennedy ran, and they tried to intercept him. Will Prince pursued, but Roland Butler caught him. Kennedy cried for help, and then Will Prince called to his father to "Come out this way." Will Prince the next day

told Caldwell how Kennedy had dived down stairs "under the shadow of a gun," and was an "immaculate coward."

On the evening of January 9, 1901, the evidence discloses that about 4:30 o'clock, William Prince was seen walking on the second floor of the new Ridge building at and near the point where the killing of Phillip Kennedy took place next day, and on the same evening defendant was seen on the stairway between the second and third floors.

On the 10th of January, 1901, Will Prince and defendant ate their lunch together at home, and either left together or soon after joined each other, as they were seen walking together west on Eleventh street between Park and Olive. He was seen to give her something which she retained, apparently covered with a handkerchief. About 3 p. m. she got aboard an electric car. Will went to his father's pool room where defendant soon joined him. There she, her father and the two brothers had a conversation, after which she and Will went into the hall and had an earnest conversation for fifteen or twenty minutes, and she left, somewhere between 3:30 and 4 o'clock. Without repeating the details of the homicide it is sufficient to say that when Thomas Kennedy, a brother of deceased, seized the defendant as she fired the last shot into the body of his brother, William Prince was so close that he struck Thomas Kennedy and pulled him away from defendant. No one recognized him just then as defendant's brother and he slipped out of the Ridge building, leaving his hat, and did not return to claim it, he says, because advised by his lawyer not to do so.

This, in brief, is an epitome of the part played by William Prince in this tragedy. And it is urged by defendant that there is no evidence of conspiracy between this brother and sister to kill Phillip Kennedy or do him any bodily harm.

Recalling the steps of the defendant, her father and brothers from the time they met deceased in the Nelson building on the 4th day of December, 1900, when the alternative was presented to him of marrying defendant or death, the enforced trip to the recorder's office under the guard and surveillance of the four; denied the right to communicate with Bullene until the mockery of a marriage had been consummated; the oiling of his revolver by William Prince on that morning; the demand of a month's maintenance by the father and William about the first of January, and the flight of Kennedy "under the shadow of William's gun" when he refused the demand; the whispered conferences of defendant with the other three at her father's pool room not exceeding an hour before the fatal shots were fired by defendant; the reconnaissances by William and defendant of the halls and entrances to the office of deceased in the new Ridge building on the afternoon preceding the homicide; the hovering of William Prince and defendant in the halls while Dr. Cross was sent forward to decoy the deceased into the hallway, the sudden appearance of defendant on the scene armed with a deadly weapon which she had hidden under her jacket, and the shooting to death of Kennedy because he declined to talk with her or live with her, to our minds and our understanding of the law, is the evidence of a deliberate scheme and combination between the defendant and her father and brothers to force Kennedy to marry defendant and live with her as her husband and to murder him if he refused to do so. To the self-serving statement to Dr. Cross, that she was afraid her father and brothers would hurt him, I attach little importance in view of the fact that at that very moment she herself was armed with the revolver with which in a few minutes, she, not her father or brothers, shot and killed Kennedy.

That she was a party to the criminal conspiracy and that William Prince who was lurking near in the

hall was fully cognizant of her purpose to kill and was hovering there to aid and assist in the execution of the conspiracy, the testimony leaves no doubt whatever in my mind. That he was a party to the conspiracy and that the conspiracy had been formed prior to the forced marriage ceremony on the 4th of December, 1900, and the subsequent acts down to the fatal shooting of Kennedy were but parts of one and the same unlawful purpose, I think was clearly established.

The authorities are quite conclusive that the conspiracy is sufficiently shown when it is made to appear that the common purpose was to commit an unlawful act even dissimilar to the one actually perpetrated, if the latter was one that might have been reasonably contemplated as likely to result from the attempt to commit the act intended. [4 Am. and Eng. Ency. of Law, 619.]

But here the purpose was expressed to be to kill Kennedy if he refused to marry defendant, and then when he had submitted to that, to kill him if he refused to live with her or persisted in trying to annul the marriage. These threats, while varying in form, all indicated one fell purpose.

We think the court properly admitted the proof of William Prince's statements pending the conspiracy.

The fourth objection to evidence relates to what occurred on the trip which defendant, Will Prince and Bullene made to Kennedy's home on Saturday night after the forced marriage. When the editor of the Star had refused to change the report in that paper at the demand of defendant unless Mr. Kennedy would agree to her version, it was agreed that she, her brother and Bullene should go and see him. Will Prince proposed that Bullene call Kennedy to the door, and that Bullene should interview Kennedy while they stood around the corner out of sight, but in hearing. Mr. Bullene refused to do this. Arriving at the house Bullene went in and talked with Kennedy, and when he came out told defend-

ant at her request what Kennedy said—in substance, that he (Kennedy) had gone to Nearing's office on the morning of the marriage and had been told that he had to marry her; that he refused, and that in going out into the corridor he was met by her father, C. W. Prince and Will Prince; and Mrs. Kennedy and her father and Will told him he had to marry her or be a dead man in five minutes, "and he married her."

The sole and only objection to this statement, which Bullene made to defendant at her request, after she had requested him to get Kennedy's version of the marriage, was that it was incompetent. No ground was assigned for its incompetency, and in fact, the same evidence as to the forced marriage was shown in other ways—and she had told various witnesses herself of his engagement to another woman and assigned that as a reason for forcing him to marry her. Bullene was detailing a conversation with defendant.

The evidence of Roland Butler, the stenographer, as to the interview of C. W. Prince, the father, and William Prince, the son, with Kennedy over the board bill and the flight of Kennedy, was admitted but subsequently excluded by an instruction of the court. In our opinion, as it was a step and an act tending to show the settled purpose to force Kennedy to support and recognize defendant as his wife or kill him if he refused, the first ruling was correct and the court erred in excluding it by instruction. It necessarily follows that it is no ground for reversal.

Again, it is insisted that the court erred in permitting Costello to state that a few moments after twenty-five minutes to six o'clock on the evening of January 10, 1901, he met C. W. Prince, the father of defendant, at the entrance of the new Ridge building, as some person ran by saying, "There was a woman up there shooting her husband," and Prince was much excited, and the witness said to Prince, "That is your daughter up there shooting that fellow Kennedy, her husband," and he

answered, ''That is who it is; keep still.'' We think it was competent. It tended to prove that C. W. Prince knew that the homicide was to take place at that time and was there at the place of its perpetration as one of the conspirators. But in no event could it have injured the defendant as all the evidence established that his daughter, the defendant, did do the shooting, and this was the statement merely of a conceded and otherwise thoroughly established fact in the case. It was, moreover, contemporaneous with the killing and not subsequent.

It is asserted that error was committed in permitting Costello to testify that C. W. Prince said to him in answer to his suggestion that Kennedy would get a divorce, ''I would like to see him get a divorce. He is dealing with the old man now, and he isn't so old he can't take care of himself.'' The evidence being sufficient to go to the jury to show that C. W. Prince was a party to the conspiracy, the covert threat implied in this language was competent to go to the jury to show the purpose of the conspirators to kill Kennedy if he refused to live with defendant as her husband.

The most important and serious error assigned on the admission of evidence on behalf of the State is the ruling of the court in permitting Dr. Cross to testify as to what occurred between the defendant and himself. This testimony is severable—that which occurred on the day and just previous to the homicide, and that which occurred on a previous occasion.

As to what occurred on the 10th of January, 1901, the record discloses that defendant went to the office of Dr. Cross and said to him that she was not Mrs. Case Patten, but was Mrs. Kennedy; that she was in trouble, and requested him to go and tell her husband that she was in the same condition in which she had been— begged him to go. Said he would be doing her the greatest favor he had ever done anybody, and he would never regret it; that the papers (the suit for annulment)

would be served on her, and her father would make her fight this suit and everything would come out. She said, "I am afraid my father and brother will hurt him." He didn't remember whether she said harm him or shoot, or do some damage to him. "If you will go over there and tell him I am in this condition, he will talk to you." The doctor at first refused to go to see Kennedy, when she said, "Do you want me to go home and shoot myself?" and thereupon he went to Kennedy's office. The doctor explicitly testified that the treatment of the defendant was not mentioned on that day; that she did not want to be treated by him in a professional way, and made no statement with that in view. Her statement at that time that she was not Mrs. Case Patten, but Mrs. Kennedy was not made with a view to treatment, but was a communication that she could have made as well to any other person, and we see no ground for holding what there occurred was privileged or incompetent. The defendant was invoking the physician's aid as a friendly act wholly disconnected from his professional obligations. The relation of physician and patient did not exist as to any communications made to him that afternoon.

Section 4659, Revised Statutes 1899, prescribes the rule of privilege and incompetency in this State. That section provides that a physician shall be incompetent to testify "concerning any information which he may have acquired from any patient while attending him in a professional character, and which information was necessary to enable him to prescribe for such patient as a physician, or do any act for him as a surgeon."

Now it is perfectly obvious, as Dr. Cross testifies, that defendant did not seek his services as a physician on the afternoon of January 10, 1901. She desired no treatment at his hands as a physician and what she told him of her physical condition was with no purpose on her part to enable him to prescribe intelligently for her, but was made ostensibly at least to induce Kennedy,

the deceased, to receive and treat her as his wife. What she told him as to her pregnancy then was not a privileged communication within the meaning of the law, and it was competent.

Now, as to the evidence of statements made on a previous occasion. Dr. Cross without objection was permitted to testify that he was a physician in Kansas City and had been for twelve years. His office was in the Rialto building, and had been for nine or ten months previous to January 10, 1901. He knew Phillip Kennedy and the defendant Lulu Prince Kennedy. He first saw and met defendant in his office in the Rialto building in the latter part of October or first part of November, 1900. She came to his office and requested him to make an examination to determine her condition, but he first asked her name and several other questions. She refused to tell him her name, but finally told him her name was Mrs. Case Patten. She said her husband was a baseball player. She said she was recently married and she wanted to know what her condition was; she didn't want it known who she was, whom she married, because Mr. Patten would probably lose his job if it was known he was married. She requested the examination, which he made. She said she thought she was pregnant and wanted him to determine. She gave him a history of herself, but he could not positively determine, but based on what she told him and her symptoms, condition and all, he was of the opinion she was pregnant. He gave her no treatment. Asked if she requested an abortion, the Doctor declined to answer or said nothing.

To all the foregoing there was neither objection nor exception taken.

She came again the next day or day after, and requested treatment, and he treated her. For what he treated her or what treatment he gave her he did not state. The only objection raised to anything said on

Vol 177 mo—12

the second visit was to what she said concerning her name, which the Doctor says she still gave as Mrs. Case Patten. The information as to her name did not and could not enable him to prescribe for her.

The greatest difficulty in reaching a proper conclusion arises as to what information the Doctor testified he received from defendant on her third visit to him. The substance of it was that she told him she wanted something in the way of medicine for sleeplessness, and he inquired if she was all right otherwise, and she told him yes, all right, and he understood that she was not pregnant. Conceding, which we think is correct, that it would ordinarily be necessary and proper for a physician to know whether a female patient was pregnant or not in order to prescribe medicine for any other ailment, and that the doctor was permitted or required to state that the defendant told him she was not pregnant on her third visit, and that he then prescribed for her sleeplessness, and conceding this was a misconstruction of our statute, the question arises, was it reversible error? How did it materially affect the case? The evidence *aliunde* abundantly established she was not pregnant. The material fact disclosed was that she stated to the physician she was all right—that is, not pregnant—at that time. Abundant testimony was introduced to show affirmatively that defendant was not pregnant, and without objection or exception. As was said in State v. Rapp, 142 Mo. 449, "Now with all that non-excluded testimony as to numerous other threats left with the jury, it is difficult to conceive how testimony as to a single threat could seriously prejudice the defendant, and we hold it did not." So we say here, with all this evidence that defendant was not pregnant, confirming her statement made at that third visit, how can it be said that the admission of that statement, albeit made to a physician and therefore privileged under the circumstances, prejudiced the defendant's rights before the jury? We hold it was not reversible error.

Counsel for defendant also insists that error was committed in permitting the State to show the relations of defendant with Case Patten in the summer of 1900, and down to October, and her visit to him at Westport, New York, just a few weeks prior to the forced marriage with Kennedy. As to this objection many reasons suggest themselves why it was not error.

It must be borne in mind that the defense interposed in this case was emotional or hysterical insanity, produced by the inconstancy of deceased as a suitor to defendant. Because of said alleged breach of his promise to marry defendant, deceased had been forced by defendant and her father and brothers under threat of death to marry her. What more pertinent evidence could have been introduced to the jury to disabuse their minds that defendant's mind had been deranged by brooding over the faithlessness of deceased, than that which disclosed that he was not only not a suitor, but had been forbidden to visit her early in the spring of 1900, and that during the summer of 1900 the defendant was the constant associate of another young man, Case Patten, to whom she had loaned her diamond ring and was wearing his watch, and that she was seeking his company and walking and riding with him both night and day, and that she had even gone unattended to Westport, New York, as late as October, 1900, to see him and get her ring from him. Certainly this was utterly inconsistent with the theory that she was infatuated with deceased and was pining away because of his neglect or was driven to madness because he had jilted her. The evidence tended strongly to disprove that she was, during all these months, the trusting affianced of deceased. Moreover, it was entirely competent to prove her acts and statements to show she was perfectly rational; that her conduct was that of a sane and not an insane person as the defendant insisted she was.

But in addition to all this, the defendant proved the Patten episode, her trip to New York, with much more

particularity than the State did.   For all these reasons
we hold no error was committed in permitting the State
to show the very intimate relationship with Patten at a
time when the jury were asked to believe she was the
trusting affianced of deceased.

Neither was error committed in proving that de-
ceased brought his suit to annul the forced marriage.
The petition itself was not offered and read in evidence,
though for some reason not apparent to us, counsel for
the State have incorporated it in their statement of the
facts and abstract.   An examination of the entire record
discloses no such paper as the petition in the annulment
case in the record.   It was shown by defendant's state-
ment that such a suit was filed, but not served prior to
the homicide.   The fact that it was begun, simply as a
fact, was admissible in connection with the threats of C.
W. Prince as to what would follow such an attempt.

We are now brought to an examination of the errors
assigned on the exclusion of evidence offered by defend-
ant.   It was too plain for argument that the testimony
of Edward W. Lewis and Arthur A. Kuhn, as to state-
ments by deceased, not a part of the *res gestae,* were
properly excluded.   The deceased was no party to the
record, and his admissions, unless a part of the *res
gestae* or as dying declarations, do not conclude the
State.   [State v. Curtis, 70 Mo. 594; McMillen v. State,
13 Mo. 30; State v. Punshon, 124 Mo. 457; State v.
Bauerle, 145 Mo. 1; State v. Nocton, 121 Mo. 537.]

Equally inadmissible were the statements of de-
fendant in her own behalf, made at the pool room to
Will Prince.   There was not the slightest foundation
or offer to show that her statements made at that time
would have tended to show her insane.   There was no
offer whatever to make such proof—for that purpose.

Judge Gibson was allowed to state all the circum-
stances of the marriage ceremony he performed and
hence there is no ground for complaint in regard to his
evidence.

As to the instructions, the counsel for defendant have not pointed out any specific instruction which they assert was erroneous. We have examined them carefully, and find no error in those given for the State, but we gravely doubt whether the court was justified, in view of all the evidence, in submitting the issue of insanity to the jury. As that was altogether favorable to defendant, of course she has no ground to complain of it.

A careful examination of the objection as to the indorsement of the names of the witnesses relieves the prosecuting attorney of any charge of unfair practice to defendant. He served the written list on the defendant, as it was so large all the names could not have been well indorsed on the indictment itself. Counsel for defendant had expressed himself as being satisfied with the list and made no objection as to the time of the service. A few witnesses were discovered after the trial began, and notice was given of the intention to use them. We agree with the criminal court, there is no merit in this point.

Upon a full examination of this record I think the judgment should be affirmed, and, hence, dissent from the judgment of my brethren.